UNITED STATES of America
v.
James Riddle HOFFA, Defendant.

UNITED STATES of America
v.
James Riddle HOFFA, Owen Bernard Brennan and Bernard Bates Spindel, Defendants.

United States District Court
S. D. New York.

On Motions for Continuance
Oct. 24, 1957.

On Motions to Dismiss Indictments
Nov. 6, 1957.

On Motions to Suppress Evidence
Nov. 6, 1957.

Paul W. Williams, U. S. Atty., Daniel F. McMahon, Chief of Criminal Division, New York City, for the Government, John D. Roeder and Jerome J. Londin, Asst. U. S. Attys., New York City, of counsel.

Sol Gelb, New York City, for defendants James Riddle Hoffa and Owen Bernard Brennan.

Harris B. Steinberg, New York City, for defendant Bernard Bates Spindel.

HERLANDS, District Judge.

On Motions for Continuance.

Can the defendants obtain a fair and impartial trial at this time in view of widespread adverse pretrial publicity about them, and in particular about the defendant Hoffa? This is the question posed by motions made by the defendants for a postponement of the trials of the two indictments herein.

In the moving affidavit, sworn to October 1, 1957, defendants ask to have the trial of the wiretapping indictment deferred for a "substantial period of time." In the moving affidavit, sworn to October 16, 1957, defendants ask for an "indefinite" postponement of the trial of the two indictments.

The first indictment (C. 153–18) charges the defendants Hoffa, Brennan and Spindel with a conspiracy to violate Title 47 U.S.C.A. § 605.

It is important to note at the outset that section 605 relates only to "inter-

state or foreign communications by wire or radio".

The period of the conspiracy, as charged, is from on or about January 1, 1953 up to and including the date of the filing of the indictment, May 14, 1957. The gist of the alleged conspiracy is that the defendants would intercept wire communications and publish the contents of such intercepted communications without authority by the sender of the communications, and that the information contained in said communications would be used for the benefit of the defendants and for the benefit of others not entitled thereto. The indictment further charges that it was part of the conspiracy that Hoffa and Brennan would procure Spindel to install various wire tapping devices so as to permit Hoffa and Brennan to intercept telephonic communications being transmitted over telephones located in the Teamsters Union headquarters, 2741 Trumbull Avenue, Detroit, Michigan, which communications were of persons including officers and employees of various local unions affiliated with the International Brotherhood of Teamsters. In addition, the indictment charges that part of the conspiracy included the interception of telephonic communications of persons using the telephones located in the Teamsters Union Headquarters Building who might be called to appear before Joint Hearings conducted by Special Subcommittees of the Committee on Government Operations and Education and Labor, House of Representatives, Eighty-third Congress of the United States of America, conducting an investigation of alleged labor racketeering practices in the area of Detroit, Michigan. A similar charge is made with regard to the interception of telephonic communications of persons who might be called before a Grand Jury investigating alleged labor racketeering in the City of Detroit, Michigan, and also persons who might be called to appear at hearings conducted by a Special Subcommittee of the Committee on Education and Labor, House of Representatives, Eighty-third Congress of the United States of America, conducting an investigation of Welfare Funds and Racketeering.

The indictment lists 16 overt acts.

The trial of this indictment was adjourned to September 23, 1957 and then to October 15, 1957.

On October 2, 1957, defendants Hoffa and Brennan made the present motion. The motion was returnable and argued in behalf of all of the defendants on October 15, 1957.

The second indictment (C. 154–26) was filed on September 25, 1957, after Hoffa had been excused by the Senate Committee. It names only Hoffa as a defendant. It charges him with having committed five counts of perjury in violation of Title 18 U.S.C. § 1621.

The alleged perjury took place while Hoffa was testifying as a witness before a Federal Grand Jury in this District, which was investigating "possible violations of the wiretapping, racketeering, obstruction of justice and conspiracy laws of the United States, and other Federal criminal statutes."

On October 15, 1957, Hoffa pleaded not guilty to the perjury indictment. On the same date, his attorney argued a motion for an indefinite continuance of the trial. (A formal notice of motion was filed on October 18, 1957, with the Court's permission.)

Pointing out that the first indictment was filed on May 14, 1957, and the second indictment was filed on September 25, 1957, defendants argue that "on or about August 1, 1957" and continuing "unabated since that time" and "presently in progress" defendant "Hoffa has been the target of an unparalleled attack by newspapers, periodicals, radio, movie and television," "spearheaded by a Select Subcommittee of the United States Senate which has openly avowed its intention to destroy the defendant Hoffa" (Defendant-Hoffa's memorandum, p. 3). Defendants have submitted several hundred exhibits designed to show that it is impossible for them, especially Hoffa,

to obtain a jury that will be able to render a fair and impartial verdict based solely upon the trial evidence.

The United States Attorney contends that, notwithstanding admittedly widespread adverse pretrial publicity, there is a reasonable likelihood that a fair and impartial jury can be selected; that prior experience with similar situations justifies that belief; that Hoffa will continue indefinitely to be a controversial public figure; and that, in any event, the way to determine whether a fair and impartial jury can be drawn is by the actual proceedings upon the *voir dire*.

The answer to the problem of a fair trial in the face of widespread adverse pretrial publicity about a defendant has been found, in the overwhelming majority of cases, by adopting a pragmatic approach. The courts have utilized a procedure that will secure a just and moral result in accordance with constitutional standards.

American law has been distinguished by its freedom from juridical metaphysics. It is characterized by an emphasis upon the achieving of practical justice by workable means consonant with the traditional ideals of fairness and impartiality.

 In view of the controlling authorities cited in the course of this opinion, this Court has concluded that the defendants' motions to postpone the trials of the two indictments herein indefinitely or for a substantial period of time should be, and hereby are, denied in all respects.

 Under the circumstances disclosed by the facts in this case, the defendants' constitutional rights to a trial by a fair and impartial jury will be protected by the proper utilization of the *voir dire*. If, upon the conduct of the *voir dire*, it should appear that there is genuine doubt whether the defendants can obtain a fair and impartial trial, that doubt will be resolved in favor of the defendants in accordance with the canon that constitutional rights should be liberally construed. In that event, the de-

fendants, if so advised, may move for a continuance.

The following judicial decisions have clearly enunciated the law applicable to situations where, as here, there has been widespread adverse pre-trial publicity about a person named as a defendant in a criminal case: Dennis v. U. S., 1950, 339 U.S. 162, 168, 70 S.Ct. 519, 94 L.Ed. 734; U. S. v. Moran, 2 Cir., 1956, 236 F.2d 361; U. S. v. Dennis, 2 Cir., 1950, 183 F.2d 201, 226–228, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, 376, certiorari denied 1955, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713; United States v. Moran, 2 Cir., 1952, 194 F.2d 623, 625, certiorari denied 1952, 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362; United States v. Bando, 2 Cir., 1957, 244 F.2d 833, 838; Allen v. U. S., 7 Cir., 1925, 4 F.2d 688, 697–698, certiorari denied Hunter v. U. S., 1925, 267 U.S. 597, 45 S.Ct. 352, 69 L.Ed. 806; Finnegan v. United States, 8 Cir., 1953, 204 F.2d 105, 110, certiorari denied 1953, 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347; United States v. Dioguardi, D.C.S.D. N.Y.1956, 20 F.R.D. 33, 35–36; United States v. Malinsky, D.C.S.D.N.Y.1957, 20 F.R.D. 300; United States v. Eisler, D.C.D.C.1947, 75 F.Supp. 634, 638 [motion for change of venue], D.C.Cir., affirmed 176 F.2d 21, certiorari denied 1949, 337 U.S. 912, 968, 69 S.Ct. 1150, 93 L.Ed. 1723; United States v. Carper, D.C.D.C.1953, 13 F.R.D. 483, 487 [motion for change of venue]; Commonwealth v. Millen, 1935, 289 Mass. 441, 194 N.E. 463, 474, certiorari denied 1935, 295 U.S. 765, 55 S.Ct. 924, 79 L.Ed. 1706.

The principles enunciated by the above authorities, and which are determinative of the issues now before the Court, are:

 (1) The mere fact that there has been widespread adverse pre-trial publicity about the defendant does not, by itself, establish the reasonable probability that the defendant cannot obtain a fair and impartial jury at the criminal trial.

■ (2) The mere fact that prospective jurors have read newspaper or other publicity items critical of the defendant does not, by itself, establish bias, pre-judgment or other disqualification on the part of the prospective jurors.

■ (3) Where there has been widespread adverse pre-trial publicity about the defendant, the proper procedure in the vast majority of cases is not to postpone the trial indefinitely or for a substantial period of time, but to proceed to trial and to determine upon the *voir dire* of the panel and the individual talesmen whether a fair and impartial jury can be selected.

■ (4) The *voir dire,* when conducted in accordance with Rule 24, Federal Rules of Criminal Procedure, 18 U.S.C., is an effective and practical method of resolving on a factual basis the otherwise debatable and speculative question whether a fair and impartial jury can be selected.

■ (5) The denial of a motion for an indefinite or substantial continuance predicated upon widespread adverse pretrial publicity about a defendant is all the more warranted when, as here, there is sound reason to believe that the defendant will continue to be a controversial, publicity-invoking figure and, hence, that there is little assurance that the passage of time will result in an abatement or subsidence of critical publicity in the foreseeable future.

■ (6) When, as here, the court is faced with the alternatives of either postponing the case indefinitely or proceeding to trial and meeting the challenge of the problem of drawing a fair and impartial jury, the court is charged with the responsibility of making the best practical decision under the circumstances; that is, to try the case and ascertain upon the *voir dire* whether, in fact and in law, a fair and impartial jury can be selected.

As was said by Judge Learned Hand in the Dennis case, 2 Cir., 1950, 183 F.2d 201, 226, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857:

"The choice was between using the best means available to secure an impartial jury and letting the prosecution lapse. It was not as though the prejudice had been local, so that it could be cured by removal to another district; it was not as though it were temporary, so that there was any reasonable hope that with a reasonable continuance it would fade. * * * Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have."

■ In certain highly exceptional situations, sharply distinguishable from the present case, the trial should be postponed indefinitely or for a substantial period of time. The propriety of such a postponement is illustrated in such decisions as: Delaney v. U. S., 1 Cir., 1952, 199 F.2d 107, 39 A.L.R.2d 1300; Shepherd v. Florida, 1951, 341 U.S. 50, 71 S. Ct. 549, 95 L.Ed. 740; and United States v. Dioguardi, D.C.S.D.N.Y.1956, 147 F. Supp. 421.

Since the defendants rely heavily upon the Delaney and Shepherd cases, this Court will discuss them in some detail.

In the Delaney case, after the defendant had been suspended and then removed from office by Executive Order, two indictments against him were returned by a federal grand jury on September 14, 1951. The defendant was charged with tax frauds while serving as Collector of Internal Revenue in the District of Boston. On October 16, 1951, after the filing of the indictments and the arraignment of the defendant, a Congressional Committee (the so-called King Committee) commenced public hearings to investigate the defendant's activities, *specifically including those activities which were the subject of the indictments.*

*The U. S. Department of Justice requested the Committee not to hold the public hearings because of possible prejudice to the defendant and because they would disclose the prosecution's evidence.* 199 F.2d at pages 109–110. *The counsel for the defendant sent a written request to the Committee to defer the hearings until after final disposition of the indictments,* stating that the hearings would further prejudice the defendant's rights to a fair trial in the prosecution then before the court. 199 F.2d at page 109.

Among the witnesses who were summoned and appeared before the Committee were many who had testified before the grand jury that had returned the indictments against the defendant, and who later testified at his trial.

> "In this respect the committee hearing afforded the public a preview of the prosecution's case against Delaney without, however, the safeguards that would attend a criminal trial." 199 F.2d at page 110.

The defendant himself was *not* subpoenaed, invited or requested to attend these hearings. These hearings produced a considerable amount of damaging public testimony "focused upon alleged derelictions of appellant Delaney," which received widespread press and radio coverage. The hearings ended on October 22, 1951.

On November 15, 1951, the defendant moved for a continuance. The trial court denied the motion and set the case for trial beginning December 3, 1951. On November 29, 1951, the defendant filed a second motion for a continuance. The court granted this motion and postponed the trial to January 3, 1952. On January 3, 1952, the defendant filed a third motion for continuance, which the trial court denied.

The Court of Appeals for the First Circuit found that, after indictments had been filed against the defendant, the King Committee publicly produced *direct evidence of the defendant's guilt of the specific offenses charged in the indictments,* as well as evidence of other criminal activities, *without* affording the defendant an opportunity to appear before those public hearings to defend himself against the charges, thus creating a public preconception of guilt of the crimes charged at the time the defendant was brought to trial.

One of the critical aspects of the Delaney case, as pointed out in subsequent judicial comments upon it, was— to quote the words of Circuit Judge [now Mr. Justice] Harlan, in the Flynn case, supra, 216 F.2d at pages 375–376—that the King Committee's public hearings related to the acts of Delaney "for which he had been * * * indicted"; that the hearings "in effect amounted to an advance legislative trial of Delaney * * * upon the very transactions involved in his indictment"; that the activities of the Congressional Subcommittee must have had a direct impact upon public opinion *"as to the charges against the very defendant* under indictment"; and that the Subcommittee had made a "pointed attempt" to probe publicly *"into the issues"* involving the defendant in advance of his trial. (Emphasis supplied.)

In United States v. Stein, D.C.S.D. N.Y.1956, 140 F.Supp. 761, 768, the Court pointed out:

> "There [in the Delaney case] the publicity was directed to the defendant specifically and to the offense for which he was about to be tried. In practical effect the case against him was pretried in the public press. See United States v. Mesarosh, 3 Cir., 233 F.2d [449] at page 458; United States v. Flynn, 2 Cir., 216 F.2d [354] at page 375."

In United States v. Mesarosh, 3 Cir., 1955, 223 F.2d 449, 458–459, the Court said:

> "In Delaney, there was a Congressional hearing after indictment but before trial which was directed specifically at the defendant and his allegedly illegal activities *for which he had been indicted."* (at pages 458–459) (Emphasis supplied.)

As will be shown below, when we refer to the actual transcript of the hearings at which Hoffa testified:

1. Unlike the King Committee, the McClellan Committee withdrew any question to which Hoffa's attorney objected on the ground that it might concern a pending indictment.

2. Unlike the King Committee, the McClellan Committee conscientiously and successfully avoided matters directly relevant to the prosecution's charges or issues involved in the then pending indictment.

3. Unlike the King Committee, the McClellan Committee subpoenaed Hoffa. Hoffa appeared and testified, while his attorney was seated next to him, giving him advice from time to time and interposing appropriate objections, when deemed necessary.

In Shepherd v. Florida, supra, a conviction of the three defendants, who were Negroes, for rape of a seventeen-year-old white girl, was reversed by the United States Supreme Court, in a Per Curiam opinion. Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.

Mr. Justice Jackson (whom Mr. Justice Frankfurter joined) concurred in the result and wrote a separate opinion. Perhaps the best way to show how fundamentally different that case was from the case at bar is to read the following from Mr. Justice Jackson's opinion, 341 U.S. 51, 52, 53, 71 S.Ct. 549:

"Newspapers published as a fact, and attributed the information to the sheriff, that these defendants had *confessed*. No one, including the sheriff, repudiated the story. Witnesses and persons called as jurors said they had read or heard of this statement. However, no *confession* was offered at the trial. The only rational explanations for its nonproduction in court are that the story was false or that the *confession* was obtained under circumstances which made it inadmissible or its use inexpedient. (Emphasis supplied.)

\* \* \* \* \*

"But neither counsel nor court can control the admission of evidence if unproven, and probably unprovable, *'confessions'* are put before the jury by newspapers and radio. Rights of the defendant to be confronted by witnesses against him and to cross-examine them are thereby circumvented. It is hard to imagine a more prejudicial influence than a press release by the officer of the court charged with the defendants' custody stating that they had confessed, and here just such a statement, unsworn to, unseen, uncross-examined and uncontradicted, was conveyed by the press to the jury. (Emphasis supplied.)

\* \* \* \* \*

"But that is not all. Of course, such a crime stirred deep feeling and was exploited to the limit by the press. These defendants were first taken to the county jail of Lake County. A mob gathered and demanded that defendants be turned over to it. By order of court, they were quickly transferred for safekeeping to the state prison, where they remained until about two weeks before the trial. Meanwhile, a mob burned the home of defendant Shepherd's father and mother and two other Negro houses. Negroes were removed from the community to prevent their being lynched. The National Guard was called out on July 17 and 18 and, on July 19, the 116th Field Artillery was summoned from Tampa. The Negroes of the community abandoned their homes and fled.

"Every detail of these passion-arousing events was reported by the press under such headlines as, 'Night Riders Burn Lake Negro Homes' and 'Flames From Negro Homes Light Night Sky in Lake County.' These and many other

articles were highly prejudicial, including a cartoon published at the time of the grand jury, picturing four electric chairs and headed, 'No Compromise—Supreme Penalty.'

"Counsel for defendants made two motions, one to defer the trial until the passion had died out and the other for a change of venue. These were denied."

Defendants' reliance upon the Shepherd case, like their reliance upon the Delaney case, is completely misplaced.

In the Dioguardi case, D.C.S.D.N.Y. 1956, 147 F.Supp. 421, the Court adjourned the trial for four months in view of certain special circumstances—none of which exists in the present case. The indictment naming eight defendants had been severed for trial purposes into two parts; one part, involving Miranti, Bando, Telvi and Carlino went to trial first. The other part, involving Dioguardi and three others, was to be tried thereafter.

The Court pointed out the following facts (at page 422):

"The trial of the Miranti case was reported in detail in all of the metropolitan newspapers in this district. * * *

"The United States Attorney made every reasonable and proper effort to confine the trial testimony to the three defendants then on trial.

"Nevertheless, the evidence unavoidably and, to a certain extent, necessarily made reference to Dio and others of the present defendants.

"A statement of Miranti to the FBI (Trial Exhibit 10) and his grand jury testimony (Trial Exhibit 12), implicated Dio by name as having paid certain sums of money in connection with the attack on Victor Riesel. The newspaper publicity attendant upon the trial of the Miranti case contained references to Dio as the alleged mastermind of the acid-throwing attack and as the boss or higher-up in the conspiracy. News concerning the forthcoming trial of Dio and the others was interwoven with the published accounts of the Miranti trial.

"Thus, Dio and his co-defendants have purportedly been identified as co-conspirators of the defendants who have just been convicted after a three-week trial.

"It must be kept in mind also that the publicity of the past several weeks has been publicity concerning a trial, not concerning preliminary proceedings; publicity based upon sworn testimony, not upon surmise; publicity about a jury's verdict of conviction and not about an investigator's suspicion of guilt. That publicity must be superimposed upon the considerable publicity during the period immediately preceding the trial of the Miranti case."

All of the State cases and the Manitoba decision cited in defendants' brief are likewise sharply distinguishable from the case at bar. In Commonwealth v. Balles, 1947, 160 Pa.Super. 148, 50 A.2d 729, the defendant was a headmaster of a co-educational school. He was convicted of rape of a fourteen-year-old girl and solicitation of sodomy. A great deal of publicity described the lurid details of the alleged crimes. The trial judge was compelled to exclude the public for fear of a hostile demonstration. This was one of three grounds relied on by the court for granting a new trial.

The case is clearly distinguishable from the present one because of the nature of the crime and the extremely inflamed state of local public opinion.

In Reed v. State, 1927, 94 Fla. 32, 113 So. 630 defendant was put on trial for murder one day after the indictment was handed down. The Court found no prejudice to the defendant but, by way of obiter dictum, said that, where great public excitement and indignation have been aroused, the trial ought to be postponed.

Mickle v. State, 1919, 85 Tex.Cr.R. 560, 213 S.W. 665, is not in point. In that case a Negro was accused of murdering a white man. There was great public clamor and excitement. As a result, the defendant had to be taken to another county for safekeeping. When he was brought to trial, he was under an armed guard. Soldiers guarded the courtroom. All the blinds and shutters of the courtroom were drawn. This was only one of several grounds for the reversal.

For the same reason, Seay v. State, 1922, 207 Ala. 453, 93 So. 403 does not apply. In that case the defendant was accused of a heinous murder. At all times a mob was present outside and inside the courtroom. The trial judge unsuccessfully tried to exclude the public.

In McDaniel v. Commonwealth, 1918, 181 Ky. 766, 205 S.W. 915 the defendant, a Negro, was accused of the murder of a well-liked white man. He had to be removed from the county for safekeeping because of threats of mob violence. The mob was in attendance in the courtroom; and six of them were chosen to serve on the jury as bystanders. The appellate court granted a new trial on this ground and on the further ground that there had been lack of opportunity to confer with counsel.

In Fountain v. State, 1919, 135 Md. 77, 107 A. 554, 5 A.L.R. 908, a Negro was accused of rape. While being taken to the courthouse, he was attacked by a lynch mob and escaped. He was captured two days later. His escape was mentioned to the jury. State militia were brought in to guard the jail and courthouse with drawn bayonets.

In Caldwell v. State, 1932, 164 Tenn. 325, 48 S.W.2d 1087, the defendant was accused of misusing public funds at a time of great financial crisis in the community. Local newspapers carried the story. The State Legislature investigated the case up until the time of the trial, with a great deal of accompanying publicity. Before the court were 100 affidavits of leading citizens to the effect that there could be no fair trial at the present

time. In spite of this, the appellate court indicated that it would not have interfered with the trial judge's refusal to postpone, if the trial judge had not conducted his own investigation of the situation. The appellate court thereupon exercised its own discretion and, on the record, granted a new trial.

In Rex v. Willis, 1913, 23 Manitoba 77, 9 Dom.L.Rep. 646 the defendants were accused of the murder of a baby. Sensational stories were published in all the newspapers. A confession was published although there was doubt as to its admissibility. As a result, the trial court granted a postponement. This case adopted the traditional English attitude on newspaper publicity before trial. In addition, this case involved serious prejudice to the defendant inasmuch as the confession had come to the jury's attention and a ruling as to its inadmissibility could not cure the harm.

An examination of the several hundred newspaper items and five magazine articles and editorials, in evidence as defense exhibits herein, shows that such publicity has produced a situation that differs in fundamental and vital respects from that which existed in any of the cases relied on by the defendants.

According to the moving papers, Hoffa appeared and testified publicly before the McClellan Committee on four days. The stenographic transcript of all of Hoffa's testimony has not been submitted to the Court. Because specific references to certain portions of the testimony on August 23, 1957 are contained in the moving affidavits and memorandum submitted in behalf of Hoffa (Memorandum, pp. 4, 5; moving affidavit sworn to October 1, 1957, pp. 2, 3; moving affidavit sworn to October 16, 1957, pp. 4, 5, 6), the Court requested the defendants to submit the full transcript of Hoffa's testimony given on the August 23, 1957 session. That transcript has been submitted to and analyzed by the Court.

In an effort to show that the facts of the present case approximate or resemble those involved in Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, the

moving affidavit sworn to October 16, 1957, states (p. 4) that a reading of the August 23, 1957 transcript "will readily show" that Hoffa was questioned by the Senate Committee "on facts concerning this case". The affidavit then refers to "electrical equipment," which, however, is not otherwise identified in the affidavit. The affidavit quotes one passage and cites other pages in the transcript. The affidavit then declares (p. 5) that the Senate Committee sought to draw the inference that Spindel was engaged in work for Hoffa "in violation of the Federal Communications Act," and that the Committee persisted in questioning "along these lines" in spite of the objections of Hoffa's attorney.

In view of the fact that the prosecution and the defense differ diametrically as to what transpired before the McClellan Committee, the Court will turn to the stenographic transcript itself. This reference to the transcript itself is made all the more necessary because neither the moving nor the opposing papers set forth this material.

The transcript shows that what the Committee was questioning Hoffa about was the subject of Minifons and not wiretapping. The Committee made it clear to Hoffa and his attorney that it was not going into the area of wiretapping and that it would not question Hoffa about the matters involved in the then pending indictment, which is the wiretapping conspiracy indictment before this Court.

The stenographic transcript of the August 23, 1957 examination of Hoffa shows the following:

At page 3720 to 3721, Hoffa, in reply to a question whether Dio had ever sent anybody to help Hoffa, said he did not know what Mr. Kennedy was talking about.

At page 3721, Hoffa said he could not remember, in reply to a question whether Dio ever sent any individual or individuals or any groups out to Detroit to perform a job for him.

At page 3721, Hoffa was asked whether he paid one of the individuals for the work he did in 1953. Hoffa replied that he could not recall what or who Mr. Kennedy is talking about.

At page 3722, Hoffa was asked whether Dio arranged to have an individual come and assist Hoffa in a project out in Detroit. At this point, pages 3722 to 3723, Mr. Hoffa's attorney asked for leave to consult with Mr. Kennedy, chief counsel to the Committee, "to find out what this matter concerns" because "it might be a matter that was excluded, I believe, by the ruling of the Chair, and that was not going to be gone into" * * * "a matter affecting a pending indictment in New York State."

At page 3724, Mr. Kennedy said that Hoffa is "under indictment not with Mr. Dio".

At page 3725, Hoffa was asked whether he and Dio arranged for any one to go out to Detroit to help Hoffa "in any project in 1953". Hoffa replied that he could not remember. (p. 3726) Hoffa could not remember whether Dio visited him in 1953 in Detroit (p. 3726), or whether Dio brought "something" out to him (p. 3726), or whether Dio brought him any "office equipment" (p. 3727).

At pages 3728 to 3731, there was put into the record a transcript of a telephone conversation between Dio and Hoffa on June 2, 1953. This showed that Dio had told Hoffa he had "a couple of those things", perhaps "four of them", but two of them "for sure".

At pages 3732 and 3733, Hoffa said that the foregoing part of the conversation seems to be "a rather jumbled up telephone conversation" and he does not recall what the four "things" were and whether the incident happened.

At pages 3733 to 3734, Hoffa admitted that he had bought some Minifons but he did not recall whether Dio had anything to do with that.

At pages 3734 to 3735, it was testified that the Minifons were around the office and were used to "report some union

meetings" and to "record information" at meetings of a "political and other nature".

At page 3735, Hoffa stated that he had looked at a Minifon to see how it worked.

At page 3736, he testified that he did not recall whether he passed out Minifons to Teamster business agents.

At page 3736, he testified that he had bought Minifons from Spindel, a man from New York. But he does not know whether Spindel brought them to him.

At page 3736, Hoffa's attorney addressed the Chair and said (at p. 3737) the following:

"Mr. Spindel is indicted jointly with Mr. Hoffa in the Southern District of New York for a conspiracy to violate Section 605. It seems to me that we are getting very, very close to the borderline here, and I do not want to."

Thereupon the following colloquy ensued (p. 3737):

"The Chairman: You do not use a minifon in wire tapping, do you?

Mr. Fitzgerald: No, but we are moving into that area, Mr. Chairman.

"The Chairman: If we do not get into wire tapping, we are not into that area of wire tapping, and that is what he is indicted for."

At pages 3738 to 3739, Hoffa described a Minifon, said it was used for recording; it can be placed in your hand or in your pocket (p. 3739).

At pages 3740 to 3741, Hoffa persisted in saying that he did not recall whether the telephone reference to four of "these things" relates to Minifons or what that expression means.

The questioning then turned to (at pages 3741 to 3743) "how many Minifons" Hoffa bought. Hoffa then said he had been questioned by some investigating body several months ago in connection with some bill that had been paid for by the Teamsters.

At that point the following proceedings took place, and I quote from pages 3742 to 3743:

"Mr. Hoffa: As to the Chair, if I may address the Chair, this concerns my indictment, sir, and am I required to answer the question?

"The Chairman: Let us see now. What was the question?

"Senator Mundt: The question was, which local paid for the minifon.

"The Chairman: I don't believe that you are indicted for these minifons, are you?

"Mr. Hoffa: But the time I was questioned, sir, the question came up.

"The Chairman: If it came up in connection with his indictment, I wouldn't ask him that. You can ask him where he got them and whether he paid for them and so on. I don't want to do anything that would interfere.

"Senator Mundt: Does it interfere with your rights as an indictee to ask you what you did with them after you got them?

"The Chairman: The Minifons are not involved in the indictment.

"Senator Mundt: No.

"The Chairman: The Minifons are not involved in the indictment and I understand the indictment is for wiretapping and Minifons is a different thing.

"Senator Mundt: I haven't asked you whether you used these as a wiretapping device, and I don't think you did."

At page 3747, Hoffa was asked whether he had bought and used the Minifons for the purpose of placing them on witnesses who went into the grand jury room in order to obtain a recording of their testimony. Hoffa conferred with his attorney answering. He then answered that to the best of his recollection no such thing had been done. (p. 3749)

At page 3749, he was asked whether Dio made any arrangements to send people out to Hoffa's Detroit headquarters. He said he did not remember. A transcript of a telephone conversation between Hoffa and Dio on June 16, 1953 was put into the record at pages 3751–3757. In this conversation, there is a reference to Dio's "man" getting to Detroit; and Hoffa said. "and they are doing that work"; "he (Hoffa) had to have 13 last week for supplies; Hoffa said, "He wanted $500 for (inaudible) supplies"; Dio said, "Those are the best —* * * and whenever you want to need 'em any part of the country if you want to find out they're your people let me know. You know what I mean?"

At page 3759, when asked what the foregoing conversation related to, Hoffa said he could not remember and he persisted in that answer. (pp. 3760–3763)

At page 3766, Hoffa was asked some questions about "Bert." The name of "Bert Brennan" was mentioned by Hoffa, and then the following took place, at pages 3768 to 3769:

"Mr. Fitzgerald: May I address the Chair?

"The Chairman: You may.

Mr. Fitzgerald: I have acted as counsel for Mr. Hoffa, and the counsel of record is Mr. Sol Gelb of New York. I have worked with him on the case under which Mr. Hoffa is indicted with Mr. Brennan and Mr. Spindel in the Southern District of New York, for conspiracy to violate Section 605 of Title 47 of the U. S. Code.

"I am satisfied from the grand jury's investigations that this wiretapping recording that you read bears directly upon that, and is part of the Government's case, and will be so used in the Southern District of New York.

"Now, I am sure that the General Counsel and the staff of this committee know that. I did not believe it possible that they would want to pursue a subject of this kind with a man under indictment.

"Mr. Kennedy: Do you want to say this under oath, Mr. Fitzgerald?

"Mr. Fitzgerald: I am talking as counsel.

"The Chairman: Be brief. We agreed and the committee has held and I have held and I think you agreed that a Minifon could not be used for wiretapping, and the indictment is for wiretapping.

"Mr. Fitzgerald: This is not related to the Minifon. This partakes of every part of the indictment in New York. I say I don't think that the Chair or this committee realizing that, would want to pursue this inquiry further when Mr. Hoffa has to stand trial.

"The Chairman: All right, just a moment.

"Mr. Fitzgerald: I would like questioning deferred on it and I make it in good faith.

"The Chairman: Thank you very much. The Chair will not pursue the matter any further at this time."

During the course of the oral argument of these motions the Court requested the Government to submit an affidavit with regard to the following questions:

1. If these cases are ordered to trial will there be public hearings with respect to the defendant James Riddle Hoffa before the Senate Select Committee on Improper Activities in the Labor or Management Field (otherwise known as the McClellan Committee) prior to the trial date and/or during the trial?

2. If such hearings will be held, will the defendant James Riddle Hoffa be called as a witness?

3. If such hearings are held, will persons close to the defendant James Riddle Hoffa be called as witnesses in public hearings?

In response to the Court's request for such information, the United States Attorney submitted an affidavit (sworn to October 17, 1957) in which he states:

"On October 16 deponent informed counsel for the Select Committee, Robert Kennedy, of the Court's questions via telephone to Washington and deponent was given the following information and assurances:

"1. If these cases are set for early trial the Committee has no present intention of calling the defendant James Riddle Hoffa during the pendency of the trial or trials or during the trial or trials;

"2. That he did not foresee that any witness would be called on a public hearing who would offer testimony directly involving the defendant James Riddle Hoffa in the next few weeks;

"3. That within the next few weeks the Committee will not call any witnesses in the public hearing with respect to the legality of the recent Teamsters Union election."

While not expressed as a ground for relief in the notices of motion herein, the defendants, in their memorandum of law submitted after the oral argument, contend that this Court should postpone the trial until after the United States Supreme Court has passed upon the questions of law involved in the Benanti case, United States v. Benanti, 2 Cir., 1957, 244 F.2d 389, certiorari granted 78 S.Ct. 6.* There is not enough before the Court at this time concerning such questions and their impact upon the issues of fact and law in the cases at bar to warrant a postponement upon that ground.

The motions are denied in all respects.

On Motions to Dismiss Indictments.

The defendant Hoffa (referred to herein as defendant) has moved to dismiss the indictments on the grounds:

(1) That the wiretapping conspiracy indictment is based in part upon the testimony of Hoffa "who was called to testify before a grand jury investigating possible crimes committed by the said defendant, James Riddle Hoffa, in violation of the defendant's constitutional and common law rights"; and

(2) That the perjury indictment "is predicated upon a proceeding in which the defendant was called to testify as a witness before the grand jury, in violation of his common law and constitutional rights.

"The proceeding before the grand jury is accordingly a nullity, and no perjury charge can be predicated upon the defendant's testimony given in that proceeding." (Notice of motion)

In support of these motions, there has been submitted only a moving affidavit by defendant's attorney, sworn to on October 29, 1957. Neither the defendant himself nor any of the eleven witnesses named in that affidavit has submitted a sworn statement as to any of the purportedly material facts, including the subjective fact as to what "Hoffa was led to believe." (Moving affidavit, page 6.)

Furthermore, in the moving affidavit, asserted facts are interwoven with arguments, conclusory statements, and summary characterizations of what various witnesses are supposed to have told the grand jury and what and whom the grand jury was supposed to have been investigating.

The Court seriously doubts the adequacy of the motion papers even according to the liberal views expounded by Judge Frank in United States v. Scully, 2 Cir., 1955, 225 F.2d 113, 117–118, certiorari denied 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788.[1]

---

\* The Benanti case was argued before the United States Supreme Court on October 29, 1957.

1. The present case is much stronger than Scully on the critical point of warning. Hoffa was clearly and expressly advised of his Fifth Amendment privilege. That fact is not disputed. In Scully the defendant was not so advised and that circumstance raised the crucial issue of law

The thrust of the defendant's attorney's affidavit is that at the time when the defendant was subpoenaed and he testified before the Grand Jury, *"the Government knew* that Hoffa was a *prospective defendant"* (page 1 moving affidavit), that "he was already *marked by the Government* as a *prospective defendant"* (page 2), but that "Hoffa was led to believe that he was being called as a *witness,* not as a prospective defendant" (page 3). [Emphasis supplied.]

According to the moving affidavit, the foregoing circumstances spell out a violation of his "constitutional and common law rights". What those particular rights are, in terms of the alleged violation, has not been defined or otherwise delineated in the defendant's motion papers; nor has defendant submitted a memorandum of law on the subject.

Upon the oral argument, defendant's attorney took the position "that when Hoffa asked whether or not he is a witness or a prospective defendant, the answer [of the Assistant United States Attorney] was equivocal" [Minutes, page 68]; "they were equivocal when they answered Hoffa as to whether or not he was a witness or a prospective defendant" [Minutes, page 69].

When examined, the record facts, as detailed in the course of this opinion, did not make it evident that Hoffa was to be named in an indictment for a wire tapping conspiracy or for perjury when he was called before the grand jury.[2] It certainly was not evident nor intended at the time when Hoffa appeared before the grand jury on April 3, and 4, 1957, that Hoffa would be indicted for perjury because the alleged perjury could not have been committed until Hoffa gave his testimony. Squarely in point is United States v. Parker, 7 Cir., 1957, 244 F.2d 943, 947. Moreover, stated broadly, perjury must be proved by two witnesses or the testimony of one witness plus some corroboration. It was not until September 25, 1957, more than five months after Hoffa testified, that the perjury indictment was filed.

As to the charge of a wire tapping conspiracy, it is likewise clear that the grand jury had embarked upon a "John Doe" conspiracy investigation without advance knowledge or forecast as to what persons, if any, might eventually be shown to have engaged in a conspiracy to violate a federal statute. At some point of time before April 3 and 4, 1957, the Government apparently had or developed some information about the suspected installation and use of electronic eavesdropping equipment, an office intercommunication system, the checking of the union's telephone wires to see whether they were tapped and the installation of a device to prevent or warn against future wire tapping of the union's wires. These subjects were not free from complexity nor difficulties of legal proof.

The moving affidavit commingles allegations about "the alleged electrical

---

therein. Judge Frank's entire opinion is premised upon the foundation fact that there had been no warning.

Nevertheless, and solely for the purpose of showing the burden of proof on defendant, we point to Judge Frank's analysis of the cognate problem: 225 F.2d at pages 116, 117 "Several state and federal courts have gone further in holding or indicating that warning is necessary if it unmistakably appears that, when a witness is under subpoena before a grant jury, the prosecutor than intends to seek the witness' indictment. * * * The government argues that any such rule would be most undesirable since it would require or permit an inquiry into the prosecutor's intentions.

That seems to me an inadequate argument. * * * I think, however, it would be improper to permit such an inquiry if the subsequently indicted witness merely alleged, without more, that such had been the prosecutor's intention. I think it should be a condition that *the indicted person* state under oath, at least on information and belief, *specific facts* pointing *very clearly* to the existence of such an intention. * * *" [Emphasis supplied.]

2. Cf. Judge Frank's statement in the Scully case (at page 118): "I think the quoted questions did not make it evident that Scully 'was to be named' in an indictment."

job", "an electronic communication system in the office," and "electrical equipment" with allegations about "wire tapping", a method of factual presentation that this Court has had prior occasion specifically to comment upon in its decision of October 24, 1957 denying defense motions for an adjournment of the trial.

At the time when Hoffa appeared before the grand jury, it was an open question for fair inquiry whether Hoffa, among others, had had anything to do with wire tapping in violation of the Federal Communications Act, § 605, 47 U.S.C.A. § 605.

The nature, extent, reliability and ramifications of the information and evidence in the grand jury's possession were necessarily subject to searching exploration by that inquisitorial body.

The grand jury is an investigating agency. Its task is to ferret out and act on evidence of crime. In the normal progression of a "John Doe" conspiracy investigation the data coming before a grand jury may range from leads, clues and hearsay to evidence, and, perhaps, eventually to a prima facie case warranting a true bill. The inculpatory inferences to be drawn from evidence and the probative value of such evidence cannot be charted and pinpointed in advance. A theory of guilt, a pattern of conspiracy, its methods and objectives and participating personnel, are the elements of development, gradual and cumulative.

Such terms as "possible defendant," "potential defendant," "prospective defendant," "putative defendant" and "de facto defendant," [3] when applied without prior definition to a grand jury witness in a "John Doe" conspiracy investiga-

tion, are neither synonymous nor precise words of art in the criminal law.

The fulcrum around which defendant's argument pivots is the factual allegation that Hoffa was a "prospective defendant" when he was subpoenaed and testified, and the asserted legal proposition that it was an invasion of his constitutional rights to subpoena him and have him testify before the grand jury "as a witness" at a time when he was a "prospective defendant."

In effect, defendants claim that Hoffa received immunity when he so testified, notwithstanding the undisputed facts that he was advised of his Fifth Amendment privilege and he expressly waived that privilege.

In point of fact and in point of law, this contention is devoid of the slightest merit. Disregarding the ambiguity lurking in the defendant's use of the term "prospective defendant," the Court finds: (1) that Hoffa was fairly and correctly characterized as a witness when he appeared before the grand jury; (2) that, at the time of his appearance and testimony, it could not have been fairly asserted or concluded that he would probably be indicted; (3) that the grand jury had no then present intention to indict any particular person; (4) that the determination of who, if any one, would be indicted was a contingent event that depended upon the evidence coming before the Grand Jury; (5) that one of such eventualities was the possibility that Hoffa might be indicted, if the Grand Jury found the evidence so warranted; and (6) that Hoffa, in the face of all of the foregoing which was conveyed to him in unmistakable language, then proceeded to waive his Fifth Amendment privilege and declared he would testify "irrespective of whether

---

3. It has been said that the word "de facto" has "no fixed and definite sense." Keppel v. Petersburg R. Co., C.C.D.Va.1868, 14 Fed.Cas. pp. 357, 370, No. 7,722. Cf. Hoskins v. Dickerson, 5 Cir., 1917, 239 F. 275, 277 ("de facto soldier"); In re Rochester Sanitarium & Baths Co., 2 Cir., 1915, 222 F. 22, 28 ("de facto of-

ficer"); In re Hillmark Associates, D.C. S.D.N.Y.1942, 47 F.Supp. 605, 606 ("de facto corporate office and residence"); Claus v. City of Fairbanks, D.C.Alaska 1951, 95 F.Supp. 923, 926 ("de facto corporation"); Farmers & Mechanics Nat. Bank v. Logan, 1878, 74 N.Y. 568, 575 ("de facto contract").

or not the truth may or may not incriminate me."

The Court has closely examined the 217 pages representing Hoffa's Grand Jury testimony on April 3 and April 4, 1957. Hoffa's testimony on the morning of April 3 covers 67 pages. Immediately after Hoffa was sworn in as a witness, the following appeared:

"Witness: May I ask a question prior to answering questions?

"Foreman: Yes.

"Witness: Am I here as a witness or as a prospective defendant?

"Foreman: Will you outline the situation.

"Mr. Roeder: Mr. Hoffa, this is a Grand Jury investigating a conspiracy, pursuant to Title 18, Section 371. It is a John Doe conspiracy. At this moment there are no prospective defendants. You are a witness before this Grand Jury. There is no intention on the part of any person here to form any indictments unless the Grand Jury finds that any indictments should be forthcoming pursuant to their investigation.

"Witness: May I have an opportunity to discuss with my lawyer your statement, please?

"Mr. Roeder: Certainly. Before you do, Mr. Hoffa, I'd like to ask you a few questions.

"Witness: Well, I would rather—

"By Mr. Roeder:

"Q. What is your name, please? A. James R. Hoffa, H-o-f-f-a.

"Q. Mr. Hoffa, you understand that this Jury, as I've just stated, is here investigating, pursuant to the Criminal Code of the Federal Government, and that it is within the realm of possibility that the Jury may decide that there are certain events that have taken place that involved you, and the Fifth Amendment applies to you and you need not answer any question which you feel, in all fairness, would tend

to incriminate you. Do you understand that? A. I do. May I now—

"Q. Do you have any questions about that? A. I would like to see my lawyer.

"Q. Do you have any questions about what I've just said? A. I understand clearly what you have said.

"Mr. Roeder: I think it's all right that this witness be excused to speak to his lawyer.

"Witness: Thank you.
[Witness leaves room, then returns]

"Witness: Mr. Roeder, you're discussing—

"By Mr. Roeder:

"Q. Mr. Hoffa, have you consulted with your attorney? A. Yes, sir, I have.

"Q. Who is your attorney? A. Sol Gelb.

"Q. Is that your only attorney with whom— A. Mr. George Fitzgerald is there, not acting as my attorney in this instance.

"Q. Where, Mr. Hoffa? A. In the conference room across the hall.

"Q. Did you consult with Mr. Fitzgerald? A. No, sir, Mr. Gelb. Mr. Roeder, I'm taking you at your word, that I'm called here as a witness. I recognize my rights under the Fifth Amendment. I recognize also that the gentlemen and ladies here in this Jury have a right to decide, after listening to testimony, what action they deem necessary to take. I do not desire to take the Fifth Amendment. I have never taken it in my life. I intend to tell this entire Grand Jury the truth of the entire matter, irrespective of whether or not the truth may or may not incriminate me.

"Q. Mr. Hoffa, you understand that the Grand Jury and we are only interested in the truth and the whole truth. There is no question about that. We expect that every question that is asked of you and

which you answer will be answered truthfully and with the whole truth. A. I have so sworn."

The morning session of April 3, 1957, adjourned at 12:30 p.m. and resumed one hour thereafter. The afternoon session covers 90 pages. When Hoffa returned from the luncheon recess, he was again expressly advised of his "constitutional protection" before he was asked a single question. Hoffa explicitly stated that he had been aware from the very beginning of his testimony that he could refrain from answering any question that would tend to incriminate him. The following appears at the very beginning of his afternoon testimony:

"Q. If there is any particular question the answer to which might tend to incriminate you, you have the right to refuse to answer that question. A. I would rather discuss that with my lawyer at the time.

"Q. But if the occasion should arise where you have a feeling that the answer might tend to incriminate you, advise us of that effect and you will be given an opportunity to consult with your lawyer."

At one point during the afternoon session of April 3, Hoffa volunteered the statement that he thought he "apparently" was not being able to convince the interrogator. The interrogator then said, "I haven't formed any opinion. What we're trying to do is to ascertain what, if anything, did occur in connection with that installation." Hoffa replied: "I'll answer your questions."

It appears that the minutes of the Union had been subpoenaed prior to Hoffa's appearing before the Grand Jury; that Hoffa, on April 2, 1957, had come from Detroit with one of his attorneys, who accompanied him to the anteroom of the Grand Jury on April 3; that Spindel had spoken to one of Hoffa's attorneys before Hoffa testified before the Grand Jury; that Brennan, who had been before the Grand Jury prior to Hoffa, spoke to Hoffa before Hoffa appeared before the Grand Jury; that sometime before Hoffa appeared before the Grand Jury he had read an article in The New York Times that mentioned "the possibility of myself [Hoffa] being called into—that I [Hoffa] was being involved in an investigation of wiretapping here."

Hoffa came prepared to answer the questions, even to the extent of having a memorandum with him showing the dates and amounts of certain checks, which he had asked his secretary to prepare the day before his grand jury appearance.

Moreover, the affidavit of Hoffa's attorney and the Court's examination of the Grand Jury docket show beyond peradventure of doubt that Hoffa and his attorneys were fully aware of a major part of the evidence that had already been presented to the Grand Jury. Hoffa was not taken by surprise, nor was he misled as to the nature or subject matter of the Grand Jury's inquiry.

On April 4, 1957, Hoffa reappeared before the Grand Jury, giving 60 pages of testimony. He had ample opportunity overnight to appraise the situation in consultation with his legal advisors. When he appeared on the morning of April 4, he told the Grand Jury, among other things:

"* * * I had no intention to invoke the Fifth Amendment when I came here and I do not intend to now."

An examination of the Grand Jury docket shows that the Grand Jury which returned the two indictments herein was impanelled on February 5, 1957. On February 26, 1957, the investigation which resulted in said indictments was entered on the docket book with the following title or caption:

"United States v. John Doe Title 18 U.S.C. 371"

Prior to February 26, 1957, when said inquiry began, the Grand Jury had held sessions on 9 different days and considered 23 other matters, in each of which the name or names of a specific defendant or defendants were entered in the title. Between February 26 and

April 3, the Grand Jury held 9 sessions in this John Doe investigation, in the course of which 19 different witnesses made a total of 27 appearances. The moving affidavit of Hoffa's attorney mentions 11 of such witnesses.

Between April 4 (Hoffa's last appearance) and October 14, 1957, the Grand Jury sat on 16 separate days, taking the testimony of 19 witnesses, who made a total of 30 appearances. The wiretapping conspiracy indictment was filed on May 14, 1957, and the perjury indictment was filed on September 25, 1957. During the period between April 4, 1957 and October 14, 1957, the Grand Jury also considered evidence in 5 other unrelated cases. This Grand Jury has not yet been discharged.

Upon the oral argument, defendant's attorney cited the Grunewald case (Minutes, p. 52). In the Grunewald case, Grunewald v. U. S., 1956, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, it appeared that one of the defendants, Halperin, had asserted his Fifth Amendment privilege before a grand jury investigating the particular conspiracy, before which he had been called as a witness (353 U.S. at page 415, 77 S.Ct. at page 979); that Halperin had declined to answer certain questions, on the ground that the answers would tend to incriminate him (353 U.S. at page 416, 77 S.Ct. at page 980); that Halperin repeatedly insisted before the grand jury that he was wholly innocent (353 U.S. at page 416, 77 S.Ct. at page 980); and that upon the trial Halperin who had taken the stand was cross-examined by the Government as to his having pleaded his Fifth Amendment privilege before the grand jury as to certain questions which he later answered upon the trial in a way consistent with innocence (353 U.S. at pages 416–417, 77 S.Ct. at pages 979–980). This cross-examination was held to be reversible error, and that "the trial court, in the exercise of a sound discretion, should have refused to permit this line of cross-examination" (353 U.S. at page 421, 77 S.Ct. at page 982).

In the Grunewald case, Halperin refused to testify before the grand jury and he claimed his privilege—whereas, in the case at bar, Hoffa did not refuse to testify and he explicitly and knowingly waived his Fifth Amendment privilege. The two cases present entirely different problems.

However, upon the oral argument herein, Hoffa's attorney said (Minutes, p. 52):

"But it is a strange thing that only recently Justice Harlan in the Grunewald case had this to say:

" 'Compelling Halperin to testify before the grand jury when he had already been marked as a putative defendant violated his constitutional rights.'

"That is what Justice Harlan said recently."

The statement by Hoffa's attorney and his ostensible quotation of an alleged expression by Mr. Justice Harlan is without foundation. What Hoffa's attorney attributes to Mr. Justice Harlan is not an expression of opinion by Mr. Justice Harlan but is actually a statement of one of the grounds of the defendant-Halperin's attack on the trial court's ruling. This appears in 353 U.S. at page 418, 77 S.Ct. at page 981 as follows:

"*Halperin attacks these rulings on these principal grounds:* (a) Raffel is distinguishable from the present case; (b) if Raffel permitted this cross-examination, then the trial court erred in refusing to charge, as Halperin requested, that 'an innocent man may honestly claim that his answers may tend to incriminate him'; (c) in any case Raffel has impliedly been overruled by Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704; and (d) *compelling Halperin to testify before the grand jury, when he had already been marked as a putative defendant, violated his constitutional rights,* so that, by analogy to the rule of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341,

58 L.Ed. 652, his claim of privilege could in no event be used against him." (Emphasis supplied.)

The United States Supreme Court did not express any opinion on defendant-Halperin's ground "d", set forth in the foregoing quotation.

Hoffa's attorney, upon the oral argument (Minutes, pp. 52–53) also cited the Scully case, 2 Cir., 1955, 225 F.2d 113, at page 116, and quoted the following passage from Judge Medina's opinion:

"It is at least clear that a prudent prosecutor, to forestall the possibility of error, will in such cases give a warning. Indeed, one would suppose that, as a matter of ethics or fair play or policy, a prosecutor would in all cases refrain from calling as a witness before a Grand Jury any person who is de jure or de facto an accused."

Hoffa's attorney relies "on some general observation without the qualifying illumination of the literary and factual context of what he quoted from the opinion in that case." Frankfurter, J., dissenting, in General Stores Corp. v. Schlensky, 1955, 350 U.S. 462, 469–470, 76 S.Ct. 516, 521, 100 L.Ed. 726.

In the Scully case, the Court squarely held (225 F.2d at page 116):

" * * * that the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment, when summoned to give testimony before a Grand Jury."

In the present case, Hoffa was advised of his rights under the Fifth Amendment. Moreover, Hoffa clearly was not "de facto an accused" when called before the Grand Jury.

In the Scully case, as well as in such other cases as Giglio, United States v. Giglio, 2 Cir., 1956, 232 F.2d 589, certiorari granted 352 U.S. 865, 77 S.Ct. 91, 1 L.Ed.2d 74 and Lawn, United States v. Lawn, D.C.S.D.N.Y.1953, 115 F.Supp. 674, Government's appeal dismissed as not timely filed, United States v. Roth, 2 Cir., 208 F.2d 467, the defendants had not been advised of their Fifth Amendment privilege when they testified before the grand jury. The legal problem presented to the Courts in the above-cited and similar cases has been "in establishing a clear-cut rule as to the necessity of a warning of constitutional rights" under certain circumstances.[4] That problem does not exist in the case at bar.

■■■ Mindful of "the rule that constitutional provisions for the security of person and property should be liberally construed," this Court has endeavored to discharge its duty "to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Mr. Justice Black in Reid v. Covert, 1956, 354 U.S. 1, 40, 77 S.Ct. 1222, 1242, 1 L.Ed.2d 1148 quoting from Boyd v. U. S., 1886, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746.

Gauged by exacting and sensitive constitutional standards, the conduct of the United States Attorney and the Grand Jury recognized and respected the defendant's rights completely. The record shows clearly that he was not tricked nor imposed upon nor misled.

■■■ On the contrary, defendant went into the grand jury room fully conscious of the nature of the inquiry, fully cognizant of what most of the other witnesses had already told the grand jury, fully aware of the risk he was taking when he waived his Fifth Amendment privilege, fully briefed in advance

---

4. Chief Judge Clark in United States v. Klein, 2 Cir., 247 F.2d 908. In the Giglio case, Chief Judge Clark said (232 F.2d at page 594, note 3) "as the two opinions in United States v. Scully, 2 Cir.. 225 F. 2d 113, show, the legal problem is still open before us"—footnoting the holding of District Judge Goddard in the Lawn case.

In the Giglio and Lawn cases the witness who was subpoenaed to the Grand Jury and who testified was at the time already a defendant named in a pending criminal information. In the Scully case, there was "the mere possibility" that the grand jury witness "may later be indicted." 225 F.2d at page 116.

by counsel, and fully advised by counsel thereafter in the course of the grand jury sessions. He cannot now convert his grand jury appearance into an immunity bath.

Motions denied in all respects.

On Motions to Suppress Evidence.

Defendants Hoffa and Brennan have moved for an order suppressing evidence and precluding the Government from introducing in evidence at the trial of the above indictments the words or substance of intercepted telephone communications, and any evidence obtained, directly or indirectly, from intercepted telephone communications.

The wire-tapping conspiracy indictment (C. 153–18) was filed on May 14, 1957; the perjury indictment (C. 154–26) on September 25, 1957.

In his opposing affidavit, the United States Attorney alleges, in part, as follows:

"The only information in my possession stemming from the interception of the defendant Hoffa's telephone communications was obtained from the office of the Honorable Frank Hogan, District Attorney for the County of New York, and from the transcripts of the defendant Hoffa's public testimony on August 20, 21, 22 and 23, 1957, before the Senate Select Committee on Improper Activities in the Labor or Management Field (McClellan Committee). I have been advised that these interceptions were made between February and June of 1953 by officers of the New York City Police Department pursuant to Court order.

"To the best of my knowledge, no member of the Office of the United States Attorney for the Southern District of New York, past or present, or any representative of any agency of the United States Government, participated in or instigated the interception of any telephone communications involving the defendant Hoffa. To the best of my knowledge, no member of the Office of the United States Attorney for the Southern District of New York, past or present, or any representative of any agency of the United States Government, had knowledge of or access to any intercepted telephone communications involving the defendant Hoffa prior to August 19, 1957, when Mr. Hogan telephoned to inform me of their existence."

The foregoing facts, as alleged by the United States Attorney, are not denied by the moving defendants. No reply affidavit has been submitted in behalf of the defendants. Upon the oral argument of the motions, defendants' attorney did not take issue with the United States Attorney as to the facts and admitted that the sole question was one of law. (Minutes, pp. 48–51)

In this Circuit, three recent decisions have squarely established the proposition that wiretap evidence obtained by *state* officers operating entirely upon their own account but in violation of Section 605 of the Federal Communications Act, 47 U.S.C.A. § 605 is admissible in a *federal* court under the following circumstances: (1) where no federal officer participated or acted in collusion in any way in the wiretap, (2) where the wiretaps were not done in behalf of any federal officer, and (3) where the state officers were not acting to enforce federal law. United States v. Benanti, 2 Cir., 1957, 244 F.2d 389, certiorari granted 78 S.Ct. 6; United States v. Costello, 2 Cir., 1957, 247 F.2d 384; United States v. Gris, 2 Cir., 1957, 247 F.2d 860, affirming D.C.S.D.N.Y.1956, 146 F.Supp. 293.

Defendants' attorney takes the position that this Court should not proceed to determine the present motions but should await the decision of the United States Supreme Court in the Benanti case, supra. (Minutes, pp. 49–50)

For the following six reasons, this Court has proceeded to decide the pending motions to suppress at this time:

1. In the Benanti, Costello and Gris cases, six different circuit judges and

one district judge sitting as a circuit judge, participated in the aforesaid decisions. In Benanti, Circuit Judges Medina and Waterman and District Judge Galston; in Costello, Chief Judge Clark and Circuit Judges Chase and Hincks; in Gris, Circuit Judges Medina, Lumbard and Waterman.

2. Each of the aforesaid decisions was rendered by a unanimous court.

3. Defense counsel has not called this Court's attention to any contrary decision by a Court of Appeals in any other circuit; nor has the Court's independent research disclosed any such decision.

4. As pointed out in this Court's prior opinion, 156 F.Supp. 502, the McClellan Committee has suspended certain phases of its investigation pending the completion of the trials of these indictments.

5. The defendant Hoffa is the head of a labor union of 1,400,000 members that has major impact upon the national economy. Thus, it is a matter of importance to the members of his union and to the public at large, as it should be to Hoffa himself, to have a speedy determination of his innocence or guilt with respect to the pending charges.

6. If the defendants' reasoning were to be adopted and applied by the Court to other legal problems, civil and criminal, the judicial business of the district courts would be greatly delayed, if not partially paralyzed.

 Under the circumstances outlined above, it would indeed be presumptuous for a district judge to hold the decision of these motions in abeyance. The law's inherent uncertainty is no excuse for the law's delay.

The motions to suppress are denied in all respects.*

---

\* Upon the oral argument, defendants' attorneys requested the Court to "set a date for hearing and if necessary should hear or give the defendant an opportunity to subpoena witnesses, if necessary, to hold hearings on successive days in order for the defendant to have an opportunity to subpoena witnesses to determine whether or not leads were obtained from wire-taps. Without such a procedure the defendants' rights cannot be protected." (Minutes, pp. 50–51) In view of the Court's disposition of the motions, there are no material issues of fact to be determined at a hearing.