UNITED STATES of America, Plaintiff-Appellee,

v.

William GIGLIO, Frank Livorsi, and Howard Lawn, Defendants-Appellants,

Louis J. Roth and American Brands Corporation, Defendants.

No. 249, Docket 23620.

United States Court of Appeals Second Circuit.

Argued March 6, 7, 1956.

Decided April 20, 1956.

590

Milton R. Wessel, Sp. Asst. to U. S. Atty. for Southern Dist. of N. Y., New York City (Paul W. Williams, U. S. Atty., New York City, and Ira L. Tilzer, Tax Atty., Internal Revenue Service, New York City, on the brief), for plaintiff-appellee.

Solomon A. Klein, Brooklyn, N. Y. (Harold W. Wolfram, New York City, on the brief), for defendants-appellants Giglio and Livorsi.

Milton Pollack, New York City (Samuel N. Greenspoon, New York City, on the brief), for defendant-appellant Lawn.

Before CLARK, Chief Judge, MEDINA, Circuit Judge, and GALSTON, District Judge.

CLARK, Chief Judge.

Appellants Giglio, Livorsi, and Lawn appeal from judgments of conviction of violations of the Internal Revenue Laws and conspiracy entered after a lengthy trial to a jury. Appellants and one other defendant, Louis J. Roth, who pleaded guilty on all counts and who was a principal witness for the prosecution, were named as conspirators in one count of a ten-count indictment charging violations of 26 U.S.C. §§ 145(b) and 3793(b) and of 18 U.S.C. § 371. In addition, Giglio was named in seven, Livorsi in three, Lawn in two, and Roth in eight substantive counts. The jury found each of the three guilty as charged. A fifth defendant named in the conspiracy count, American Brands Corporation, was eliminated by dismissal of the indictment after the jury failed to report as to it. Judge Walsh sentenced Giglio and Livorsi to a total of fifteen years of imprisonment on the various counts on which they were convicted, while he gave Lawn a total of a year and a day.

The conspiracy here disclosed involved attempts by a variety of means to evade assessment and payment of federal income taxes on large amounts of income earned in the World War II black market in sugar. The individual and corporate taxes evaded for the calendar year 1946 alone amounted to more than $800,000. Generally three means of evasion of tax assessment were used: (1) the fraudulent allocation of income among the various companies and individuals in the conspiracy, (2) the fraudulent overstatement of expenses, and (3) the failure to disclose income (a technique very infrequently resorted to by these defendants). Further, defendants attempted to defeat collection of taxes through the concealment of the individual assets of Giglio and Livorsi and the misappropriation, conversion, and diversion of corporate assets. The testimony adduced amply sustained the charge.

Giglio and Livorsi were the central figures in the conspiracy. It was they who profited so royally as equal partners in the fabulous proceeds of the wartime black market. And it was they who procured the services of Roth, an accountant, to assist them in protecting their ill-gotten gains from tax claims. Lawn, a lawyer, had been Chief of the Criminal Division of the United States Attorney's Office for the District of New Jersey before entering their employ. He participated in much of the planning of the conspiracy for evasion of taxes by Giglio-Livorsi enterprises. He held executive positions in some of the participating companies; and, although his beneficial stock interest was small, he, like Roth, received substantial compensation for his services.

It is neither necessary nor feasible to describe here all the details of the multifarious techniques of tax evasion employed in the furtherance of this conspiracy, but sufficient facts should be set forth to show the magnitude and ingenuity of the operation. In April, 1945, the Tavern Fruit Juice Company was organized as a partnership. Giglio and Livorsi, the two real partners, also listed their wives as partners, though the latter contributed no capital to the enterprise. The information return of Tavern partnership falsely listed the wives as partners, even though Giglio and Livorsi later picked up the wives' supposed distributive shares on their own personal tax returns.[1]

---

1. In this connection the witness Roth was asked the following question by the prosecutor: "Well, if you filed an individual return for Mr. Giglio and Mr. Livorsi, picking up those figures, why didn't you change the partnership information return so that it wouldn't indicate that the wives were partners?" His reply was: "The reason I didn't file—the reason I picked up the income of the wives on the individual husbands' tax return, these taxes, the tax liability, the tax that was

About a month after Tavern was organized, a second partnership, Eatsum Food Products Co., Ltd., was launched. The true partnership interest at the time of formation in this enterprise was as follows: Giglio, 25%; Livorsi, 25%; and Lubben (a key government witness at the trial below), 50%. But a partnership information return for Eatsum was filed showing several dummy partners, including the wives of Giglio and Livorsi. The wives' income was in fact picked up on the husbands' individual returns. Nine months after its formation the Eatsum partnership agreement was modified, Lubben agreeing to accept about $117,000 as his distributive share of the partnership profits in return for the right to start a separate business and Giglio agreeing to pay the taxes on Lubben's share.

Of the two partnerships, during the first nine months of operation Eatsum alone earned almost three quarters of a million dollars. In order further to reduce taxes the conspirators set up a series of corporations, each bearing in some combination the name "American." The purpose of the corporations was to drain off the profits of Eatsum through the use of fraudulent invoices. The corporations were then to be dissolved before taxes fell due, and no income would be reported. The important corporations themselves were financially successful. So, in order again fraudulently to minimize taxes, Giglio and Roth procured the filing in the name of American Brands Corporation of a consolidated return covering the associated corporations, even though they knew that the parent-subsidiary relationship required by statute did not exist.

As thus indicated, appellants rarely resorted to an actual failure to report income. Roth's testimony, however, disclosed one illuminating instance in which such a failure apparently did take place. Part of the Eatsum operation involved the purchase and sale of corn and corn syrup, with black market price overages being paid and received in cash passing through a cash box kept in the Eatsum office. Over $400,000 in cash passed through the cash box in the course of the corn syrup operations, resulting in a profit to Eatsum of about $140,000. Apart from an item of $50,000 of "Other Income" entered on both Livorsi's and Giglio's return, the cash box profit was not reported.

Another device used for the evasion of tax assessment consisted of fraudulent deductions for fictitious expenses and purchases. Along similar lines $63,091.-52 in Tavern closing inventory was not reported, thereby fraudulently reducing the reported income of Tavern and shifting the inventory to American Brands, where it would not be reported until a corporation return was filed at a later date.

In addition to their efforts to defeat the imposition of full tax liability, appellants sought in a number of ways to delay, hinder, and prevent the collection of those taxes for which they admitted liability. They accomplished this result by filing late returns, by failure to withhold taxes as required by law, by filing false estimated personal tax returns, by filing false tentative corporate returns, by filing returns in the wrong district, by filing false returns for certain third persons in order to obviate the necessity of disclosing certain "cash box" receipts by Eatsum, and possibly also by filing an inaccurate carry-back loss claim and by the erroneous reporting by Giglio and Livorsi of $50,000 of "other income." Upon the filing of all tax returns here relevant on September 15, 1947, the conspirators made an extensive effort to convert leviable assets to cash. A particularly colorful incident in this process was the sale of the Livorsi estate in New Jersey. Livorsi received a check for $64,335.49 in payment for his equity in

due, there was no money to pay, and it was never intended at that time to pay it; and in order to avoid the women having trouble with the Tax Department, we

picked up the wives' income on the husbands' tax returns, so that all the trouble would accrue to the husbands."

this property, which he subsequently cashed at the Merchants Trust Company in Red Bank, New Jersey. He left the bank with the entire amount in currency stuffed in his trousers' pockets.

Similarly, four days before the filing of tax returns, with the assistance of Lawn, Giglio transferred his New Jersey estate to Roth, even though Giglio continued to live in it. Four days after tax returns were filed a $15,000 interest in the Van Dyck Industrial Corporation held in Giglio's name was sold, the proceeds going to Roth's special bank account and thence into the American Brands Corporation; it was never used to satisfy the tax liability of the corporation. Again in September, 1947, there was a sale of the Manhattan offices of the various enterprises for $10,000; but Roth had no knowledge of this money's being used to pay taxes. Before and after the filing of returns the conspirators withdrew large amounts of cash from the various "American" corporations, charging off these withdrawals to selling or other expense. The corporations went into state receivership in New Jersey in late 1947, and loans in comparatively large amounts owed by various of the conspirators to the corporations were concealed through falsification of the books. Further, as a result of the receivership, corporate assets were sold at a sacrifice and the proceeds were not applied to discharge the federal income tax liability. One of the most substantial physical assets was the equipment in a plant in New Jersey. Years

after the disposal of this asset in receivership, Giglio continued to operate at the plant. There was evidence of concealment and destruction of records, threats to potential witnesses,[2] improper influence and bribery, receivership and bankruptcy proceedings tinged with fraud, and subornation of perjury.

The *admitted* tax liability for the year 1946 of Giglio, Livorsi, and American Brands Corporation according to their filed returns was $573,683.73. The total tax paid was $16,735.95. This astronomic discrepancy (which is exclusive of falsification of the returns themselves), when viewed in connection with the activities outlined above, demonstrates why there was no reasonable doubt of the guilt of these conspirators. This is quite obviously true as to Giglio, the active manager of the enterprises, and as to Livorsi, his equal partner, who, although not so active as Giglio in the routine operation of the businesses, nonetheless knew of and approved the major conspiratorial acts. So Livorsi, who in direct furtherance of the conspiracy demanded and carried away from the Red Bank, New Jersey, bank over $64,000 in cash received for his New Jersey estate, was clearly anything but ignorant of the fraudulent character of other activities from which he thus handsomely profited.

As for Lawn, although he did not partake of the fruits of the conspiracy on the scale of Giglio and Livorsi, there is ample evidence to establish his guilt as charged. A significant part of his value to the conspiracy was his alleged famili-

2. David G. Lubben, at one time a partner of Giglio and Livorsi, testified on direct examination as follows:

"Q. You also said in this conversation that you had previously been told to keep your mouth shut. When was that? A. I was told by Mr. Giglio to stay away from 253 [Broadway (the New York headquarters of special Treasury agents)] and to keep my mouth shut, that everything would work out all right. I was also told by Mr. Roth if I ever opened my mouth I would find myself at the bottom of the Hudson River in a cement box."

Bernard Bercu, a certified public ac-

countant, testified on direct examination:

"Mr. Giglio was in my private office, explaining to me—perhaps I will put it directly: Mr. Giglio said to me that these work papers were being destroyed because of his—because, as he said, he wanted to know that his partnership affairs were kept within his control and that no outsider knew anything about them.

"He then said to me, 'We have ways of taking care'—and this is in substance, because this happened ten years ago, or nine years ago—in substance he said, we have ways of taking care of any man who talks about our affairs out of turn."

arity with certain government officials and his purported ability thereby to ward off prosecution. He was the legal adviser to Giglio and Livorsi, and he participated in the planning and execution of a number of the schemes for tax evasion. For a person of his admitted legal astuteness to deny knowledge of the fraudulent transactions which proliferated around him is wholly amazing. He seems to have been particularly active in the formation of the "American" corporations, the concealment of Giglio's assets, and the arrangement of the New Jersey receivership; but of course his culpability is by no means limited to these phases of the developing scheme. He served as an officer or a director of several of the enterprises involved, and he received ample compensation for his services rendered in furtherance of the conspiracy.

Against this background so conclusively establishing the guilt of these appellants, numerous assignments of error are for the most part entirely insubstantial and in no event present difficulty. Primarily appellants allege an invasion of their constitutional rights through the use of evidence obtained in violation of their privilege against self-incrimination. An indictment found in 1952 against these same defendants had been dismissed by Judge Goddard, who held that defendants' testimony and production of partnership records before a grand jury constituted a violation of their privileges against self-incrimination because at the time of the grand jury hearings these defendants were also defendants in pending criminal informations and were not advised on the record of their rights. United States v. Lawn, D.C.S.D.N.Y., 115 F.Supp. 674.[3] In 1953 the indictment in the present case, similar to, but not identical with, the 1952 indictment, was found. Defendants moved to dismiss the 1953 indictment on grounds that it was tainted with the same alleged illegally obtained evidence; to suppress evidence, leads, and clues de-

rived from the tainted source; to direct a hearing to ascertain the scope of the suppression order; to direct that the minutes of the grand jury proceedings leading to the 1953 indictment be made available to defendants; and to direct return of the books and papers covered by Judge Goddard's order. Except for a direction of return of these books and papers, Judge Palmieri denied the motion in a reasoned opinion. United States v. Giglio, D.C.S.D.N.Y., 16 F.R.D. 268. At the trial, Judge Walsh, relying on Judge Palmieri's opinion and the reasoning incorporated therein, denied similar motions.

■ It was a proper exercise of discretion for the judges to rely upon the detailed affidavits of government attorneys and investigators setting forth the sources of evidence used in obtaining the 1953 indictment and demonstrating that it was not based upon the alleged illegally obtained material. The mere fact that Judge Goddard dismissed the 1952 indictment because of the use of allegedly illegal evidence did not create a requirement as a matter of law for cross-examination of government witnesses and examination of government documents and grand jury minutes; and particularly is this so in the face of the strong adverse showing made by the affidavits of the prosecution. See Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312, affirming United States v. Goldstein, 2 Cir., 120 F.2d 485; Lapides v. United States, 2 Cir., 215 F.2d 253; United States v. Flynn, D.C.S.D.N.Y., 103 F.Supp. 925. Under the circumstances here presented, the decision not to accord a full dress hearing upon oral testimony, together with disclosure of the grand jury minutes, was within the sound discretion of the court. See Carrado v. United States, 93 U.S.App.D.C. 183, 210 F.2d 712, certiorari denied, Atkins v. United States, 347 U.S. 1018, 74

3. The government's appeal was dismissed as not timely filed, United States v. Roth, 2 Cir., 208 F.2d 467; but, as the two opinions in United States v. Scully, 2 Cir., 225 F.2d 113, show, the legal problem is still open before us.

S.Ct. 874, 98 L.Ed. 345; United States v. Foster, D.C.S.D.N.Y., 80 F.Supp. 479.

■ Moreover, this is a case of great complexity developed during years of investigation. Sufficient evidence had been adduced even by 1950 for the case to become the subject of several days' testimony before the Kefauver Committee, and criminal informations were filed shortly thereafter; investigation and development of evidence continued after that time. If it be conceded that some additional evidence tainted with unconstitutionality may have entered into the finding of the 1952 indictment, it does not follow that the 1953 indictment was not based exclusively upon the massive evidence not so tainted. In the face of the government's detailed affidavits, appellants have clearly failed to sustain their burden of proving the contrary.

■ As to the further contention that the so-called "tainted" evidence may have been used at the trial itself (in contrast to its use in procuring the indictment), it is clear that appellants had a right of full cross-examination during the trial as to the sources of government exhibits and that they exercised this right on a number of occasions. On defendants' motion to dismiss at the conclusion of the government's case, Judge Walsh found nothing in the record of trial suggesting any use of illegal clues. We see no basis for contravening this finding.

■ Lawn makes strident objection to the introduction of government Exhibit 61A–B—a photostatic copy of a check payable to Lawn and the check-stub page corresponding thereto, bearing grand jury markings and allegedly elicited before the 1952 grand jury in violation of Lawn's constitutional privilege. But before introduction at the trial this evidence was the subject of preliminary questioning by Lawn's able and experienced trial counsel (now deceased) who finally interposed "no objection" to its admission. Further, on this appeal the government offers to prove that other copies of the same documents were in its possession months before the 1952 proceedings and that these "untainted" copies could have been easily substituted at trial if the discrepancy had been pointed out by objection of defense counsel. Lawn therefore suffered no harm whatsoever and has obviously waived his objection.

■ Appellants further object to various consequences of Judge Walsh's action in cautiously removing from the consideration of the jury the question of the "distributive shares" from the Eatsum partnership. In this regard the contention of the government was in essence that the distributive share of the Giglio-Livorsi group had been increased from its original 50 per cent by reason of Lubben's agreement of March, 1946, to accept $117,000 in lieu of his original share, and that, therefore, the 1946 personal returns of Giglio and Livorsi correspondingly understated their income. Appellants on the other hand argued that Lubben was charged with the full 50 per cent fixed by the original partnership agreement, and that the taxable share of the Giglio-Livorsi group could not therefore exceed 50 per cent. In order to avoid this confusing problem in tax law, the judge instructed the jury to disregard alleged understatement of income from Eatsum in considering the counts charging the falsification of individual returns. Since, however, there was evidence of understatement of income from sources other than Eatsum, the verdict on these counts must stand. The charge was not misleading.

■ In cross-examination of a government witness friendly to appellants, defense counsel elicited testimony that "Mr. Giglio was well regarded in the [Long Branch] area." Defense counsel had been previously informed by the court that his question went beyond the scope of the direct examination. On redirect examination the prosecutor asked the witness whether or not his opinion of Giglio's reputation would have been affected by knowledge of Giglio's arrest in Detroit. Judge Walsh sustained an objection to the question and instructed the jury to disregard it, although he stat-

ed that he would rule the other way if the prosecutor insisted. Since defense counsel deliberately opened the door to this line of questioning, since the prosecutor's question was in apparent good faith, and since in any event the jury was instructed to disregard the question, there was no error. See Myres v. United States, 8 Cir., 174 F.2d 329, certiorari denied 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520.

There is no occasion to discuss the numerous other assignments of error—none of which showed merit. We are constrained to say that the presentation of this appeal was marred by a virulent attack, particularly on behalf of appellant Lawn, upon the integrity and the ethics of the prosecutor. An examination of the record shows that this was utterly unwarranted. On the contrary, he and his associates conducted the prosecution with devotion, responsibility, and rare skill against experienced and determined defense. We do not think that even the exigencies of the defendants' case justified or excused this attack. The trial was fair and the result proper, if not inevitable.

Affirmed.