**UNITED STATES of America**

v.

**Richard A. CLEARY et al., Defendants.**

United States District Court
S. D. New York.

July 21, 1958.

Paul W. Williams, U. S. Atty., Southern Dist. of New York, New York City, for United States, George C. Mantzoros, Asst. U. S. Atty., New York City, of counsel.

Leonard Maran, New York City, for defendant, Richard A. Cleary.

FREDERICK van PELT BRYAN, District Judge.

Defendant Cleary is charged, in three counts of a five-count indictment against him and others, with stealing from the United States mails in violation of 18 U.S.C. § 1708 and conspiracy so to do. He pleaded not guilty. He now moves to dismiss the indictment as against him upon the ground that it was secured in violation of his rights under the Fifth Amendment to the Constitution. In essence, he claims that he was compelled against his will to testify against himself before the Grand Jury which indicted him after he had been arrested, arraigned and was out on bail on a criminal complaint making the same charges embodied in the indictment. He contends that the indictment against him was therefore based on testimony obtained in violation of his constitutional rights and must be dismissed.

The facts as adduced at a hearing held before me on defendant's request are as follows:

On April 2, 1952 Cleary, then employed by the Pennsylvania Railroad Company as a baggageman loading and unloading mail cars in the Pennsylvania Station, was arrested on a warrant issued upon a complaint filed with the United States Commissioner in this district the previous day charging him with conspiracy to steal packages from the mails in violation of 18 U.S.C. § 1708. Shortly before other Pennsylvania Railroad employees charged with the same conspiracy had also been arrested.

Cleary was arraigned before a United States Commissioner. Bail was fixed at $5,000 and he was remanded to the Federal House of Detention in default of bail. On April 9, 1952 his bail was reduced to $3,500, apparently without his appearance or specific request, and he was released on bail in that amount. He was not represented by counsel at any time from his arrest until shortly after the indictment was returned on June 12, 1952.

After his arrest, and prior to arraignment, Cleary was interrogated by the arresting Postal Inspector but refused to sign a statement which the Inspector had prepared based on the interrogation.

On April 8, 1952, the day before his release on bail, he was taken from jail to the office of the United States Attorney in this district, apparently at the request of that office. After a warning by Assistant United States Attorney Greenberg in charge of the case that Cleary had a constitutional right to refuse to answer questions, and that in the event he did so any statement could be used against him in a criminal proceeding, he was questioned before a stenographer. In substance he denied having anything to do with the alleged theft from the mails.

A few days after his release on bail he went to see Robert A. Mitchell, Esq., a member of the bar of this court. Mitchell already represented three of the other defendants who had been arrested. Cleary discussed the question of retainer with Mitchell and told him he would let him know about the fee. A few days later Cleary called Mitchell's office and advised that he could not meet his terms.

Mitchell was not retained as Cleary's attorney or counsel at any time and never represented him. Nor did Mitchell at any time discuss with Cleary his constitutional or other rights. In fact, Mitchell felt, after discussing the case with Cleary, that he could not in good conscience represent him because of possible conflicts with the interests of the defendants who had already retained him.

After Cleary's release on bail the Postal Inspector who had arrested him kept in touch with him. On three or four occasions Cleary came to the United States Attorney's office and talked to As-

sistant United States Attorney Greenberg who was in charge of the case, at Greenberg's request. Apparently Greenberg formed the impression he was willing to cooperate with the Government. However, on none of these occasions were any written statements taken from Cleary and there is nothing to show that he gave any information of value to the Government.

On May 8, 1952 a Grand Jury subpoena, returnable May 12, 1952, was issued for the appearance of Cleary before the Grand Jury. Postal Inspector Deutsch served the subpoena by leaving it with Cleary's mother at his home. On May 12 Cleary came to Greenberg's office in the United States Court House in response to the subpoena, showed Greenberg the subpoena and was told to return the following day. He appeared the next day as directed. He had no attorney with him and was not represented by counsel. At that time Greenberg took a question and answer statement from him before a stenographer in the presence of a Postal Inspector and two other Postoffice employees. The purpose of the statement was to "freeze" Cleary's testimony before the Grand Jury.

According to the transcript of the statement the following occurred at the outset:

"Q. At the very outset, I want to advise you that you have a constitutional right to remain silent and not to answer any question—in other words, to say nothing, but in the event you say anything or answer any questions, whatever you say can be used against you in a criminal proceeding; do you understand your rights? A. I do.

"Q. You are willing to make a statement, is that right? A. Yes.

"Q. You are appearing here voluntarily? A. No. (Witness shows subpoena.)

"Q. You are appearing here in my office voluntarily? A. Yes.

"Q. You have discussed this matter with your attorney, have you not? A. Yes.

"Q. What is his name? A. He isn't retaining me yet.

"Q. You have not retained him? A. No, not yet.

"Q. You did consult with an attorney prior to the time you came here to make your statement? A. Mr. Mitchell.

"Q. Mr. Robert Mitchell? A. Robert Mitchell."

Cleary was then questioned at some length concerning the subject matter of the charges pending against him and gave answers deeply incriminating him.

Cleary was not taken before the Grand Jury on that day but was directed by Greenberg to reappear the following day, May 14. He was then taken before the Grand Jury and sworn. The following then occurred:

"Q. Mr. Cleary, I want to advise you that you are an accused person, and you have a constitutional right to remain silent or not to answer any questions, or any particular question, the answer to which may tend to incriminate or degrade you. But if you do answer any questions, or make any statements, these statements can be used against you in a criminal proceeding. Do you understand that? A. I understand.

"Q. And your appearance before the Grand Jury, to give this testimony is voluntary on your part, is it not? A. That's right.

"Q. And have any promises been made to you? A. None whatsoever.

"Q. Have any threats been made to you? A. None.

"Q. Prior to your coming here, you had a conversation with an attorney, is that right? A. Mr. Mitchell.

"Q. That is Mr. Robert Mitchell? A. Mr. Robert Mitchell.

"Q. And he has advised you of your rights, has he not? A. That's correct."

The questioning then proceeded and Cleary gave, in substance, the same self-incriminating testimony as he had given in Greenberg's office the day before.

On June 12, 1952 the Grand Jury, after hearing the other defendants, all of whom, except Cleary, were represented by counsel, returned the indictment under attack here charging Cleary with the same offenses which were the subject of the complaint which had been filed and was pending against him.

I have examined the minutes of the Grand Jury on which the indictment was based. It appears from these minutes that there was testimony, other than that of Cleary himself, which indicated that he was one of those participating in organized thefts from the mails on the loading platform of the Pennsylvania Station but that he was on the periphery of the alleged conspiracy rather than one of its mainsprings. His own self-incriminating testimony, however, tied him in closely and he admitted his participation. There is nothing to indicate that Cleary's testimony was not a substantial, or even a controlling factor, in the decision of the Grand Jury to return an indictment against him.

At the hearing before me it appeared Cleary was not lacking in a certain native shrewdness and had had some education at the high school level. However, he appeared to me to be of limited intelligence. He seemed weak, feckless, overly anxious to please, and easily influenced.

He testified that he did not appear at Greenberg's office on May 12 and 13, or before the Grand Jury on May 14, voluntarily but only because the subpoena had commanded him to appear. He had never intended to appear before the Grand Jury and had never told Greenberg that he wanted to talk about the case. When he received the subpoena all he knew was that the subpoena meant he had to go to court.

Cleary said that when he was questioned in Greenberg's office on May 13 and answered "No", showing Greenberg the subpoena, in answer to the question "You are appearing here voluntarily" and then answered "Yes" to the question "You are appearing here *in my office* voluntarily", he meant merely that no one had forcibly brought him there but he had come there in response to the subpoena. He said he meant the same thing when he answered "Yes" to a similar question before the Grand Jury as to whether he was appearing voluntarily.

He further testified that when he appeared before the Grand Jury he did not understand his constitutional rights, and was nervous and mixed up. He said that he did not know, and, indeed, had never been advised, that his refusal to answer any questions could not be taken against him. In fact, he was fearful that his refusal to answer might have more serious consequences for him than if he answered. He had never made a request to appear before the Grand Jury either in writing or orally and did not intend to do so. He never discussed his constitutional rights or the Grand Jury subpoena, nor had he received any advice concerning these matters from Mitchell, the attorney with whom he had discussed retainer, or from anyone else. With the exception of one prior appearance in a civil matrimonial action, Cleary had never been in court prior to this case.

The testimony of Mitchell before me fully corroborated Cleary's statement that Mitchell had never been retained by him and had never advised him of his constitutional rights nor indicated to the Government in any way that Cleary would testify willingly.

While Greenberg was under the impression that Cleary was willing to cooperate with the Government, his recollection of what happened, other than what appeared in the written transcripts, was insufficient to impugn or contradict seriously the testimony of either Cleary or Mitchell.

At the time Cleary appeared before the Grand Jury he was still out on bail on the pending complaint against him.

Upon this state of the record two important questions are presented. First: Was Cleary compelled to give incriminating testimony against himself in violation of his constitutional rights under the Fifth Amendment? Second: If so, should an indictment, based in substantial part on testimony so obtained, be permitted to stand?

■■ The Fifth Amendment to the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." However, an accused may testify if he so desires. 18 U.S.C. § 3481 provides that "the person charged shall, at his own request, be a competent witness", thus continuing in force earlier statutes which removed a defendant's incapacity to testify in his own defense in a criminal case. It left the choice to him. See Brown v. United States, 9 Cir., 56 F.2d 997. "The purpose of the law was to make defendants competent witnesses, but at the same time preserve to them the right to remain silent without prejudice". Wolfson v. United States, 5 Cir., 101 F. 430, 436, certiorari denied 180 U.S. 637, 21 S.Ct. 919, 45 L.Ed. 710.

■ There is no doubt that an investigation by a Grand Jury for the purposes of determining whether a crime has been committed against the United States is a criminal case within the meaning of the Fifth Amendment. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110; Camarota v. United States, 3 Cir., 111 F.2d 243. It is plain that in proceedings before a Grand Jury, as upon a trial, the privilege against self-incrimination is available to an accused and that he may at his own request testify before the Grand Jury.

■ However, the question of precisely what the rights of an accused are before the Grand Jury, under what cir-

cumstances such rights may be said to have been violated, and the effect on the indictment of such violation is by no means clear. In order to place the problem in focus somewhat extended reference must be made to two recent cases in this circuit, United States v. Lawn, D.C.S.D.N.Y., 115 F.Supp. 674, appeal dismissed as not timely filed United States v. Roth, 2 Cir., 208 F.2d 467; s. c. United States v. Giglio, D.C.S.D. N.Y., 16 F.R.D. 268; United States v. Giglio, 2 Cir, 232 F.2d 589; Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321, and United States v. Scully, D.C.S.D.N.Y., 119 F.Supp. 225; 2 Cir., 225 F.2d 113, certiorari denied 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788.

In the Lawn case defendants, against whom informations were pending, were subpoenaed before the Grand Jury in an investigation into the subject matter of the informations. They were not warned of their privilege against self-incrimination. However, it does not appear that they had not been represented by counsel or received the advice of counsel concerning their constitutional rights or were unaware of them. They were questioned before the Grand Jury and gave answers and produced documents tending to incriminate them. Thereafter the Grand Jury filed indictments superseding the original informations which were based, in part at least, on the incriminating testimony given by the defendants. The defendants moved to quash the indictments on the ground that they were obtained in violation of their constitutional rights. Judge Goddard held that the constitutional rights of the defendants had been violated before the Grand Jury and that the indictments which were based in part upon testimony so obtained were invalid and should not be permitted to stand. He therefore dismissed the indictments.

Judge Goddard reasoned as follows: A mere witness may properly be subpoenaed to appear and testify before the Grand Jury. Though he may not be compelled to incriminate himself he need

not be warned of his privilege.[1] To avail himself of it he must plead it whenever the answer to a question may incriminate him.[2]

In contrast, however, a defendant against whom a criminal information has been filed may not be called by the prosecution as a witness before the Grand Jury to obtain evidence tending to sustain an indictment against him superseding the earlier information.[3] Such a defendant, said Judge Goddard, was in the same position before the Grand Jury as a defendant in the trial of a criminal case where it would be a clear violation of his rights against self-incrimination to compel him to take the stand or to call him as a witness without a request on his part.[4] Just as compelling defendant to take the stand under these circumstances would invalidate a trial, so the calling of a defendant before the Grand Jury would invalidate the indictment. "In neither situation," said the court, "is the defendant required to claim the privilege. The law grants him this protection. It is a right which he alone may waive." 115 F.Supp. 677. Since these defendants did not waive their rights, after being properly warned of their privilege, the indictments here should not be permitted to stand.[5]

An appeal by the Government from the decision of the District Court was dismissed as not timely filed (United States v. Roth, supra) and the merits of Judge Goddard's decision were therefore never passed upon by the Court of Appeals.

Thereafter a new indictment similar to but not identical with the prior indictments was found against the defendants by another Grand Jury. Defendants moved to dismiss the new indictment upon the ground that it was tainted with the same alleged illegally obtained evidence as the prior indictments which had been dismissed. They asked, among other things, for a hearing to ascertain whether, in fact, any of such tainted evidence had been presented to the Grand Jury which found the new indictment. The motion was denied by the District Court upon the ground that there was nothing to indicate that any tainted evidence had been before the Grand Jury which returned the new indictment, and that defendants had shown no substantial basis for the requested hearing. United States v. Giglio, D.C.S. D.N.Y., 16 F.R.D. 268.

The defendants were then tried and convicted. At the trial the motions previously made were renewed and again denied on the basis of the prior opinion.

On appeal from the convictions on a number of grounds the defendants again raised the question of the denial of a hearing to determine whether the later indictment had been based on evidence tainted with unconstitutionality. The Court of Appeals in affirming the conviction held there was no merit in this contention. United States v. Giglio, 2 Cir., 232 F.2d 589. However, Chief Judge Clark noted that the legal problem posed by the decision of the District Court in United States v. Lawn dismissing the prior indictments "is still open before us". (232 F.2d at page 594, note 3.)

The Supreme Court also affirmed the convictions. Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321. Again defendants urged, among other things, that they had been deprived of due process by the refusal of the District Court to conduct a full-dress hearing to determine whether the tainted evidence used in obtaining the first in-

---

1. Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979.

2. United States v. Benjamin, 2 Cir., 120 F.2d 521; United States v. Miller, D.C. E.D.Penn., 80 F.Supp. 979.

3. Mulloney v. United States, 1 Cir., 79 F.2d 566; United States v. Miller, supra; United States v. Kimball, 2 Cir., 117 F. 156.

4. United States v. Housing Foundation of America, Inc., 3 Cir., 176 F.2d 665; 8 Wigmore on Evidence, 3d ed., p. 393; 3 Wharton's Criminal Evidence, 11th ed., p. 1960.

5. United States v. Miller, supra.

dictments was considered by the Grand Jury in returning the second. The Supreme Court held that the defendants had only "unsupported suspicions" that such evidence had been considered, that they had laid no foundation for such a hearing, and that they were not entitled to it. However, the court was careful to limit its decision on this phase of the case to the sole question of whether defendants had shown sufficient to entitle them to the hearing which they had requested. The court expressly stated that it was not dealing "with the use of incompetent or legal evidence in a trial on the merits, nor with the right to decline to give incriminating testimony in legal proceedings or to suppress the direct or derivative use at the trial of evidence illegally obtained." (355 U.S. at page 350, 78 S.Ct. at page 318.)

Subsequent to the decision of the District Court in United States v. Lawn, and prior to the decisions of the Court of Appeals in United States v. Giglio, and of the Supreme Court in Lawn v. United States, a different phase of the problem arose in United States v. Scully, D.C.S. D.N.Y., 119 F.Supp. 225. There Judge Goddard, who had decided the Lawn case, denied defendant's motion to quash an indictment for conspiracy to defraud the Government on the ground that he had been subpoenaed to testify before the Grand Jury which had returned the indictment, that he did so testify, and that although the authorities had already marked the defendant for prosecution, intended to indict him, and was engaged in bringing his indictment about, "he was not advised of his * * constitutional rights against self-incrimination". 119 F.Supp. 226. Judge Goddard distinguished United States v. Lawn on the basis of the line of cases holding, in substance, that until a formal charge was openly made against an accused, either by indictment presented, information filed, or complaint before a magistrate, he could be called before the Grand Jury as a witness without being warned of his rights against self-incrimination and this was no violation of his constitutional rights.[6]

Thereafter the defendant was convicted of conspiracy to defraud the United States upon the indictment which had been sustained by Judge Goddard. On appeal from the conviction the defendants brought up for review the order of Judge Goddard denying their motion to quash the indictment upon the ground that their constitutional rights had been violated. The Court of Appeals rejected the defendant's contention that the indictment should have been quashed on this ground and affirmed.

Judge Medina, writing for the majority, discussed and analyzed the reasoning of the court below and the basis on which the cases relied on had been decided. He said that the distinction between a so-called "defendant" and a mere "witness" which formed the basis of these decisions "may be artificial and unsound" since it apparently stemmed from an effort to analogize the rights of witnesses and parties appearing before a Grand Jury to those of witnesses at a criminal trial. He concluded that "the principle which underlies the rule that the defendant in a criminal trial may refrain even from being sworn as a witness, has no application to proceedings before a Grand Jury."[7] He pointed out that the procedural safeguards protecting the rights of an accused on a trial do not apply to inquisitorial proceedings before a Grand Jury since that body "is not charged with the duty of deciding innocence or guilt and, * * * in such proceedings, there is no right to counsel, no right of confrontation, no right to cross-examine or to introduce evidence in rebuttal and ordinarily no requirement

6. United States v. Wilson, D.C.Del., 42 F. Supp. 721; Kaplan v. United States, 2 Cir., 7 F.2d 594; United States v. Pleva, 2 Cir., 66 F.2d 529; United States v. Klein, D.C.S.D.N.Y., 124 F.Supp. 476; United States v. Kimball, supra; United States v. Miller, supra; United States v. Wetmore, D.C.W.D.Penn., 218 F. 227.

7. See, also, United States v. Benjamin, supra.

that the evidence introduced be only such as would be admissible upon a trial."

The court therefore held that the mere possibility that the witness might later be indicted furnished no basis for requiring that he be advised of his rights under the Fifth Amendment when summoned to give testimony before a Grand Jury. However, the holding was expressly limited to this question. Indeed, Judge Medina stated (225 F.2d at page 116):

"If, as and when the question, whether the bundle of rights in the Fifth Amendment includes that of a defendant, already charged as by indictment, to a warning when subsequently called to testify before a Grand Jury, is squarely before us, it seems not unlikely that reasons other than the distinction between parties and mere witnesses, above referred to, may convince us that, under certain circumstances or absolutely, a warning is required. We do not now say that it is not, but only that this court has not ruled on the point."

Moreover, he went on to say:

"It is at least clear that a prudent prosecutor, to forestall the possibility of error, will in such cases give a warning. *Indeed, one would suppose that, as a matter of ethics or fair play or policy, a prosecutor would in all cases refrain from calling as a witness before a Grand Jury any person who is de jure or de facto an accused.* The absence of appeals to this court involving the problem under discussion would seem to indicate that some such rule or practice is observed in the prosecutors' offices in this circuit." (Italics supplied.)

Judge Frank, concurring in the result, disagreed with the view of the majority that "the principle which underlies the rule that the defendant in a criminal trial may refrain even from being sworn as a witness, has no application to proceedings before a Grand Jury". He thought (225 F.2d at page 116):

"* * * that the policy embodied in the privilege against self-incrimination has greater force when a man, already indicted, is called by the prosecutor to testify before a grand jury; for, unlike the defendant at the trial, the defendant before the grand jury appears without counsel to advise him of his privilege. Accordingly, I think the necessity of warning such person is even greater than after the trial commences. Therefore, I believe that United States v. Lawn, D.C. S.D.N.Y., 115 F.Supp. 674, states the correct rule."

Thus the law on this subject is plainly in no settled state at this juncture.

The facts in the case at bar differ both from those in United States v. Lawn and those in United States v. Scully, though there are some common denominators. In all three cases the person appearing before the Grand Jury appeared under compulsion of subpoena. However, defendant Cleary was not a mere witness who was a possible defendant, as in Scully, but had been arrested and was out on bail on a complaint charging him with the same offense for which he was later indicted, as in Lawn. Unlike either Lawn or Scully, Cleary was given at least a pro forma warning of his constitutional rights. He did not avail himself of his privilege against self-incrimination and proceeded to testify. It affirmatively appears, in contrast to Lawn and Scully, that Cleary had at no point been represented by counsel and had never consulted with counsel concerning his rights. Moreover, there is testimony indicating that Cleary did not understand his constitutional rights and did not waive them since he had no clear understanding of what they were.

In Scully Judge Medina indicated, contra to the reasoning in Lawn, that the mere fact of calling one who was actually under charges before a Grand Jury, did not in itself invalidate a subsequent indictment, though he questioned the propriety of so doing. If these indications, which may be dictum, be accepted,

the indictment here would not be invalidated merely because Cleary had been compelled by subpoena to *appear* before the Grand Jury. However, it is not necessary to determine this question in order to dispose of the case before me.

Scully expressly left open the question of whether a defendant already under charges, in contrast to a mere witness, is entitled to a warning when called to testify before a Grand Jury. Necessarily, it also left open the question of whether the constitutional rights of an accused in this position are violated if he proceeds to testify before the Grand Jury without a clear and express waiver of his privilege against self-incrimination.

 It appears to me that the question of waiver is controlling. Unless there has been a waiver of the privilege it cannot be said that a defendant called before the Grand Jury by compulsion of subpoena has not been "compelled" to testify against himself in violation of the Fifth Amendment. As Professor Wigmore has pointed out, the constitutional provision against self-incrimination is "an option of refusal and not a prohibition of inquiry". Wigmore, Evidence (3d ed.) § 2268. Unless, at the least, the defendant was given an option of refusal to testify and rejected it, the Fifth Amendment has been violated. His rejection of the option can only be given by waiver of the privilege express or implied. The warning serves to give the defendant a full opportunity to exercise his option.

Thus, it is necessary to determine here whether Cleary was given an opportunity to exercise his option of refusal to testify and did, in fact, reject that option and waive his privilege. This is a question of fact.

█ The provision against self-incrimination "must have a broad construction in favor of the right which it was intended to secure." Counselman v. Hitchcock, supra. Waiver of the privilege or of other constitutional rights "is not lightly to be inferred." Smith v. United States, 337 U.S. 137, 150, 69 S.Ct. 1000, 1007, 93 L.Ed. 1264; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. As the Supreme Court said in the Johnson case involving a claimed waiver of the constitutional right to be represented by counsel (304 U.S. at page 464, 58 S.Ct. at page 1023):

"* * * It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights'. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

See, also, Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177; Hodges v. Easton, 106 U.S. 408, 412, 1 S.Ct. 307, 27 L.Ed. 169. Cf. United States v. St. Pierre, 2 Cir., 128 F.2d 979; Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 276, 141 A.L.R. 1318.

Upon the present record, taking into account "the particular facts and circumstances surrounding" this case "including the background, experience and conduct of the accused", I find the following:

At the time of his appearance before the Grand Jury which indicted him, Cleary was out on bail on a complaint duly filed in this court charging him with conspiracy to steal from the mails. The Grand Jury before which he appeared was investigating the subject matter of this complaint. He had been previously arrested on this complaint and confined in jail in default of bail. At no time since his arrest had Cleary been represented by counsel and he had never discussed with, or been advised by, counsel of his constitutional rights. Cleary neither expressly nor impliedly requested to appear as a witness before the

Grand Jury. These facts were known or should have been known to the prosecutor.

Cleary appeared before the Grand Jury and, indeed, in the United States Attorney's office on the previous day, under compulsion of a Grand Jury subpoena. His appearance before the Grand Jury was not "at his request" but was involuntary. While Cleary was advised before the Grand Jury of his right to remain silent and that any answers which he gave might be used against him, he was not advised that a refusal to answer could not be held against him and he was not aware that this was so. In fact, Cleary did not understand his constitutional rights.

Lacking knowledge of his constitutional rights, being without the advice of counsel, and being compelled to appear before the Grand Jury by compulsory process, he was not in a position to make an effective waiver of his privilege against self-incrimination and did not do so. He therefore proceeded to testify under compulsion concerning the subject matter of the very complaint pending against him and gave answers which seriously incriminated him. The indictment thereafter returned against him by the Grand Jury was based in substantial part on his incriminating testimony.

In United States v. Miller, supra [80 F.Supp. 981], the court stated "* * * a defendant cannot by legal means be compelled to testify before a grand jury. This is so even though he fails to claim his constitutional privilege against self-incrimination, unless he waives it after being properly warned of his privilege."

There cannot be an effective waiver without either a proper warning or a showing that a defendant fully understood his rights. There was neither here.

The prosecutor knew, or should have known, that Cleary had not been represented by counsel and that he was appearing involuntarily and not at his own request. Under these circumstances the pro forma warning given to Cleary before the Grand Jury was not the full, complete and careful warning which should have been given. If a defendant in the position of Cleary is brought before the Grand Jury (and the propriety of this is doubtful enough in itself), the prosecutor should at least take every precaution to insure that all of defendant's rights under the Fifth Amendment are fully and carefully explained to him and that he understands them. Absent this the defendant has no real opportunity to exercise "his option of refusal" to testify, nor can it be said that he waived a privilege of which he did not have full knowledge and which he did not fully understand.

The facts and circumstances here are cumulative in their effect. Perhaps one or more standing alone would not be sufficient to impel the conclusion that Cleary's constitutional rights were violated. But taken in combination it becomes clear that there was a violation of Cleary's constitutional rights and that the indictment returned here was, in substantial part, based upon testimony secured as a result of such violation. Thus, the indictment is tainted with this infirmity.

The next question is whether an indictment obtained under these circumstances, and subject to this taint, should be permitted to stand.

The Government urges that while Cleary's testimony before the Grand Jury, if tainted, might be suppressed and not used at the trial, the taint does not render the indictment invalid. It relies principally on Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, holding that defendants in criminal cases may not challenge indictments upon the ground that they are not supported by adequate or competent evidence. See, also, Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021. However, I see nothing in the Costello case which goes so far as to hold that an indictment such as this, tainted as it is with unconstitutionality, should be permitted to stand.

It must be remembered, as Judge Weinfeld said in Application of United

Electrical Radio & M. Workers, D.C.S.D. N.Y., 111 F.Supp. 858, 863, that there are

" * * * two essential functions of the Grand Jury as it came to us in colonial days and as understood at the time of the adoption of the Federal Constitution. One was to accuse those believed to have violated the laws and to bring them to trial. The other, equally important and sometimes overlooked in this modern day, was to protect the citizen against unfounded accusation of crime, whether by public officials or by private citizens."

The same Fifth Amendment which grants privilege against self-incrimination also provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, * * *".

It grants to a defendant the right to all the protections which Grand Jury action affords.

It would be an anomaly, indeed, if proceedings before a Grand Jury, one of the functions of which under the Fifth Amendment is to protect the citizen against unfounded accusation of crime, were to result in a valid indictment based upon evidence obtained in violation of the defendant's privilege against self-incrimination granted by the same amendment. The indictment here is so tainted by unconstitutionality that it cannot be permitted to stand.

The Government's reliance on the recent decision of my brother Dawson in United States v. Garnes, D.C.S.D.N.Y., 156 F.Supp. 467 is misplaced. There the defendant was convicted, afer trial to a jury, on two counts of an indictment charging possession of heroin. The defendant then moved for arrest of judgment, raising for the first time the claim that the indictment was invalid since it was predicated upon testimony obtained from her in violation of her constitutional rights.

The defendant, at a time when she was not under arrest and no charges were pending against her, had been told that she had to appear before the Grand Jury and that if she did not she would be subpoenaed and compelled to appear. She did appear and testified. No indictment was returned against her by the Grand Jury which heard defendant's testimony, though an indictment was returned against others involved in the same transaction. Evidence relating to the defendant was thereafter presented before another Grand Jury and such evidence included the testimony which defendant had previously given before the prior Grand Jury when she was not under arrest or on charges.

Judge Dawson assumed, for purposes of the motion only, that the testimony given by defendant before the first Grand Jury, which was read before the second Grand Jury, was given involuntarily. He held that the second indictment was not invalidated by the reading of the testimony obtained before the first Grand Jury at a time when the defendant was not under arrest, nor under charges, and that sufficient protection was afforded her at the trial by the suppression of the testimony given before the first Grand Jury. Moreover, Judge Dawson held that the motion to quash the indictment had not been timely made and that a defendant could not wait until the end of a trial at which he is found guilty to make a motion to quash an indictment based upon possible defects in Grand Jury proceedings which he knew about before trial and at the time of the indictment. He therefore denied the motion to quash.

The case at bar is quite different. The motion here was made before trial and was timely. Defendant Cleary was actually out on bail on a complaint filed against him for the offense which the Grand Jury was investigating. As I have found, he had no counsel and was not aware of his constitutional rights, he was compelled to appear before the Grand Jury, he did not receive the warning required by the circumstances and he did not waive his privilege. Nevertheless, he was compelled to give testimony

incriminating himself and the indictment was founded in substantial part on such testimony.

This indictment is invalid and must be quashed. Defendant's motion to dismiss the indictment is granted.